GILMORE ET AL. *v.* CITY OF MONTGOMERY,
ALABAMA, ET AL.

No. 72–1517.  Argued January 15–16, 1974—Decided June 17, 1974

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 576. BRENNAN, J., filed an opinion concurring in the judgment, *post*, p. 577. WHITE, J., filed an opinion concurring in the judgment, in which DOUGLAS, J., joined, *post*, p. 581.

*Joseph J. Levin, Jr.,* argued the cause for petitioners. With him on the briefs was *Morris S. Dees, Jr.*

*Joseph D. Phelps* argued the cause for respondents. With him on the brief were *Drayton N. Hamilton* and *Walter J. Knabe.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The present phase of this prolonged litigation concerns the propriety of a federal court's enjoining a municipality from permitting the use of public park recreational facilities by private segregated school groups and by other non-school groups that allegedly discriminate in their membership on the basis of race. We granted certiorari to consider this important issue. 414 U. S. 907 (1973).

I

Petitioners are Negro citizens of Montgomery, Alabama. In December 1958, now over 15 years ago, they instituted this class action to desegregate Montgomery's public parks. The defendants are the city, its Board of Commissioners and the members thereof, the Parks and Recreation Board and its members, and the Superintendent of the Parks and Recreational Program.

By their original complaint, the petitioners specifically challenged, on Fourteenth Amendment due process and

equal protection grounds, a Montgomery ordinance (No. 21–57, adopted June 4, 1957) which made it a misdemeanor, subject to fine and imprisonment, "for white and colored persons to enter upon, visit, use or in any way occupy public parks or other public houses or public places, swimming pools, wadding [sic] pools, beaches, lakes or ponds except those assigned to their respective races." Both declaratory and injunctive relief were requested.[1] On September 9, 1959, the District Court entered its judgment that the ordinance was unconstitutional and enjoined the defendants from enforcing the ordinance "or any custom, practice, policy or usage which may require plaintiffs, or any other Negroes similarly situated, to submit to enforced segregation solely because of race or color in their use of any public parks owned and operated by the City of Montgomery, Alabama." The judgment was accompanied by a memorandum opinion. 176 F. Supp. 776 (MD Ala. 1959). On appeal, the Fifth Circuit affirmed but ordered the judgment modified to provide that the District Court retain jurisdiction. 277 F. 2d 364, 368 (1960). The trial court, accordingly, ruled

---

[1] Prior to the institution of the suit, some of the plaintiffs had petitioned the city's Parks and Recreation Board, and the plaintiffs and others had petitioned the city's Board of Commissioners to provide access to the city parks for petitioners and all other Negro citizens similarly situated. The chairman of the Parks and Recreation Board replied that the Board "has no authority in this matter." The Board of Commissioners responded, "The Commission will not operate integrated parks." Exhibits attached to complaint filed Dec. 22, 1958, in Civil Action No. 1490–N, United States District Court for the Middle District of Alabama, Northern Division.

Within days after petitioners filed their suit, the city authorities, by resolution effective January 1, 1959, closed all the city's recreational parks, athletic fields, swimming facilities, and playgrounds, to all persons, white and black, and did not purport officially to reopen them until 1965. The city continued, however, to own and maintain them.

that it "will and does hereby retain jurisdiction of this cause until further order." [2]

In 1970, the petitioners sought to reopen the litigation. They filed a motion asking, among other relief, that the respondents be cited for contempt "for deliberately avoiding and violating this Court's Judgment and Order in this case." [3]  The motion contained allegations that some of the municipal parks had been reopened "in such a manner to avoid the total and full integration of said parks"; that the city had conspired with the Montgomery YMCA to segregate swimming and other recreational facilities and programs; that recreational facilities were unequally allocated as between white and Negro neighborhoods; and that the city discriminated in its employment of personnel in recreational programs.  The basis for these claims arose from other, separate litigation initiated in 1969 and resulting in the granting of affirmative relief to the plaintiffs in that suit.  See *Smith* v. *Young Men's Christian Assn.*, 316 F. Supp. 899 (MD Ala. 1970), aff'd as modified, 462 F. 2d 634 (CA5 1972).  In that action the District Court found that the "coordinated effort" of the city and of the YMCA, 316 F. Supp., at 908, and an agreement between them, reached shortly before the closing of the city parks and the entry of the court's 1959 decree, had effectuated "the perpetuation of segregated recreational facilities and programs in the City of Montgomery," *id.*, at 909, and that it was "unmistakably clear that its purpose was to circumvent the Supreme Court's

---

[2] On April 22, 1964, after the case had lain dormant for four years, the District Court ordered the file closed "without prejudice to any party to this litigation petitioning this Court for a reinstatement."

[3] Petitioners' motion, filed August 7, 1970, was styled as a "Motion to Cite Defendants for Contempt and for Relief."  On October 2, the District Court granted the further motion of the petitioners that the August 7 motion be treated as an amendment to the original complaint.

and this Court's desegregation rulings in the area of public recreation." *Id.*, at 908.[4]  As summarized by the Court of Appeals, the District Court concluded:

> "[T]he YMCA, as a result of the cooperative agreement, has been performing a statutorily declared 'public function'; the Montgomery Park and Recreation Board has, in effect, transferred some of its statutory authority and responsibility to the YMCA, thereby investing the YMCA with a municipal character; and therefore the YMCA has been serving as a municipal rather than a private agency in assisting the Park Board in providing recreational programs for the city.
>
> .          .          .          .          .

---

[4] The record in that case revealed a deliberate attempt to thwart the desegregation order of the District Court. In 1958, the city and the YMCA formed a coordination committee. It was agreed that the YMCA would not offer any program that would duplicate or conflict with one offered by the city's recreation department. The YMCA conducted football, basketball, and track programs for all the elementary school children of the city, but not for the junior high students. The responsibility for administering junior high programs was delegated to the Recreation Department. Each elementary school supposedly was assigned to the nearest YMCA branch. Yet the District Court found that "every predominantly white school in the city is assigned to one of the three all-white branches even though the school may be closer to the Cleveland Avenue [Negro] branch. Every predominantly Negro school is, regardless of its location, assigned to the Cleveland Avenue branch." 316 F. Supp., at 905. The YMCA also was given free use of the city's parks, playgrounds, and lighting equipment for its various athletic programs, and free water for its swimming pools. The city did not reopen its pools after it closed the parks in 1959. "In 1957, the YMCA operated one small branch in downtown Montgomery which had less than 1,000 members. By 1960, two years after the 'Co-ordination Committee' had been created, it operated five branches with five swimming pools. Today the YMCA operates six branches with eight swimming pools and has approximately 18,000 members." *Id.*, at 908.

"[T]he YMCA's discriminatory conduct denied the plaintiffs their Fourteenth Amendment rights to Equal Protection of the law; under the facts of this case the plaintiffs' showing of 'state action' satisfies the requirement under Title 42, U. S. C. Section 1983 that the YMCA's conduct be 'under color of law.' " 462 F. 2d, at 641–642.

The modification by the Court of Appeals related only to the disapproval of a provision in the District Court's order directing a specific Negro-white ratio in the YMCA's board and executive committee. No review was sought here.

The claims raised by the petitioners in their 1970 motion were settled by agreement dated January 29, 1971.[5] On July 29, the respondents filed their first written progress report. On September 8, the petitioners filed a "Motion for Supplemental Relief." App. 15. This motion forms the basis for the present phase of the litigation. The petitioners complained that the city was permitting racially segregated schools and other segregated private groups and clubs to use city parks and recreational facilities. They requested injunctive relief against "the use of City owned and operated recreational facilities by any private school group, club, or organiza-

---

[5] The settlement agreement appears to have been aimed at providing equal recreational facilities for the Negro population of Montgomery. It specified the construction of new community centers and a new recreation center. Improvements were to be made to existing predominantly Negro facilities. The city agreed to maintain all community centers "on an equal basis and to the same manner and extent."

The agreement was approved by the District Court on January 29, 1971. Jurisdiction, however, was "specifically retained," and the defendants were ordered to file a written progress report every six months.

tion which is racially segregated or which has a racially discriminatory admissions policy."

The District Court granted the petitioners the relief they requested. 337 F. Supp. 22 (MD Ala. 1972). The court reasoned that Montgomery officials were under an affirmative duty to bring about and to maintain a desegregated public school system. Providing recreational facilities to *de facto* or *de jure* segregated private schools was inconsistent with that duty because such aid enhanced the attractiveness of those schools, generated capital savings that could be used to improve their private educational offerings, and provided means to raise other revenue to support the institutions, all to the detriment of establishing the constitutionally mandated unitary public school system. The court, consequently, enjoined the city and its officials "from permitting or in any way sanctioning the use of city owned or operated recreational facilities by any private school, or private school affiliated group, if such school or group is racially segregated or if it has a racially discriminatory admissions policy." *Id.,* at 26. The court went on, however, with sparse findings and brief discussion, and similarly enjoined the city and its officials from permitting or sanctioning the use of city recreational facilities "by any private group, club or organization which is not affiliated with a private school and which has a racially discriminatory admissions policy." *Ibid.*[6]

On appeal, the Court of Appeals reversed in part and remanded the case with directions. 473 F. 2d 832 (CA5

---

[6] The District Court's decretal provisions in full text, except for a paragraph relating to the taxation of costs, are:

"1. That the City of Montgomery, Alabama's policy and practice of permitting the use of city owned or operated recreational facilities by any private school, or private school affiliated group, which school

1973). It sustained that part of the injunction which restrained the use of city facilities by segregated private schools when that use was "exclusive" and not in common with other citizens. *Id.*, at 837. The court ruled, however, that "nonexclusive enjoyment" of those facilities by private school children "was not proven to present a sufficient threat to desegregated public education to support an injunction restraining the clear personal right of the affected children to enjoy such usage in common with the rest of the public." *Ibid.* With respect to that portion of the District Court's order concerning other private nonschool groups, the Court of Appeals held that there was no "symbiotic relationship" of the kind present and condemned in *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961). Consequently, it held that under *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163 (1972), that portion of the District Court's order dealing with

or group is racially segregated or which has a racially discriminatory admissions policy be and the same is hereby declared unconstitutional.

"2. That said City of Montgomery, Alabama, its officers, agents, servants, employees, and those acting in concert with it, be and each is hereby enjoined from permitting or in any way sanctioning the use of city owned or operated recreational facilities by any private school, or private school affiliated group, if such school or group is racially segregated or if it has a racially discriminatory admissions policy.

"3. That said City of Montgomery, Alabama's policy and practice of permitting the use of city owned or operated recreational facilities by any private group, club or organization which has a racially discriminatory admissions policy be and the same is hereby declared unconstitutional.

"4. That said City of Montgomery, Alabama, its officers, agents, servants, employees and those acting in concert with it, be and each is hereby enjoined from permitting or in any way sanctioning the use of city owned or operated recreational facilities by any private group, club or organization which is not affiliated with a private school and which has a racially discriminatory admissions policy." 337 F. Supp., at 26.

nonschool groups had to be reversed because the injunction impermissibly intruded upon the freedom of association of citizens who were members of private groups. The court, accordingly, ordered deletion of certain paragraphs of the injunctive order and the clarification of others. 473 F. 2d, at 839–840. The District Court complied with that mandate and, in particular, added the following paragraph to its injunctive order:

"The injunction issued by this Court does not prohibit the City of Montgomery from permitting non-exclusive access to public recreational facilities and general government services by private schools or school affiliated groups."

The plaintiffs petitioned for certiorari; the defendants did not cross-petition.

## II

The Equal Protection Clause of the Fourteenth Amendment does not prohibit the "[i]ndividual invasion of individual rights." *Civil Rights Cases,* 109 U. S. 3, 11 (1883). It does proscribe, however, state action "of every kind" that operates to deny any citizen the equal protection of the laws. *Ibid.* This proscription on state action applies *de facto* as well as *de jure* because "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans* v. *Newton,* 382 U. S. 296, 299 (1966). In the present case we must determine whether the city of Montgomery engaged in discriminatory activity violative of the parks desegregation order. We must also decide whether the city's involvement in the alleged discriminatory activity of segregated private schools and other private groups,

through its providing recreational facilities, constitutes "state action" subject to constitutional limitation.

## A

The Court of Appeals affirmed the District Court insofar as the latter enjoined the "exclusive possession of public recreational facilities such as football stadiums, baseball diamonds, basketball courts, and tennis courts for official athletic contests and similar functions sponsored by racially segregated private schools." 473 F. 2d, at 836-837. The boundaries of this "exclusive" use approach, however, are not self-evident. We find the concept helpful not so much as a controlling legal principle but as a description of a type of use and, in the context of this case, suggestive of a means of allocating public recreational facilities. The term "exclusive use" implies that an entire facility is exclusively, and completely, in the possession, control, and use of a private group.[7] It also implies, without mandating, a decision-making role for the city in allocating such facilities among private and, for that matter, public groups.

Upon this understanding of the term, we agree with petitioners that the city's policy of allocating facilities to segregated private schools, in the context of the 1959 parks desegregation order and subsequent history, created, in effect, "enclaves of segregation" and deprived petitioners of equal access to parks and recreational facilities. The city was under an affirmative constitu-

---

[7] We understand the term "exclusive use" not to include the situation where only part of a facility may be allocated to or used by a group, even though that allocation or use results in the *pro tanto* exclusion of others. For example, the use of two of a total of 10 tennis courts by a private school group would not constitute an exclusive use; the use of all 10 courts would. This is not to say that the use of two by a private school group would be constitutionally permissible. See discussion, *infra,* at 570-571, n. 10.

tional duty to eliminate every "custom, practice, policy or usage" reflecting an "impermissible obeisance to the now thoroughly discredited doctrine of 'separate but equal.'" *Watson* v. *Memphis,* 373 U. S. 526, 538 (1963). This obviously meant that discriminatory practices in Montgomery parks and recreational facilities were to be eliminated "root and branch," to use the phrase employed in *Green* v. *County School Board of New Kent County,* 391 U. S. 430, 438 (1968).

Instead of prompt and orderly compliance with the District Court's mandate, however, the city of Montgomery engaged in an elaborate subterfuge to anticipate and circumvent the court's order. Segregated recreational programs continued to be presented through the conveniently cooperating private agency of the local YMCA. All public swimming pools were closed allegedly to prevent the mixing of races. Facilities in Negro neighborhoods were not maintained equally with those in white neighborhoods. In light of these facts, made part of the record in this case,[8] it was entirely appropriate for the District Court carefully to scrutinize any practice or policy that would tend to abandon to segregated private groups facilities normally open to members of all races on an equal basis. Here, the exclusive use and control of city recreational facilities, however temporary, by private segregated schools were little different from the city's agreement with the YMCA to run a "coordinated" but, in effect, segregated recreational program. Such use and control carried the brand of "separate but equal" and, in

---

[8] Petitioners requested that the District Court take notice in this case of *Smith* v. *Young Men's Christian Assn.,* 316 F. Supp. 899 (1970), in which the same District Judge had presided. The trial court ruled from the bench that it would take judicial notice "of the evidence that was presented in the Y. M. C. A. case." Excerpted transcript, testimony of William Chandler, Nov. 20, 1970, p. 7.

the circumstances of this case, were properly terminated by the District Court.

Particularly important is the fact that the city's policies operated directly to contravene an outstanding school desegregation order. See *Carr* v. *Montgomery County Board of Education,* 232 F. Supp. 705 (MD Ala. 1964); 253 F. Supp. 306 (1966); 289 F. Supp. 647 (1968), aff'd as modified, 400 F. 2d 1 and 402 F. 2d 782, 784, 787 (CA5 1968), rev'd and remanded *sub nom. United States* v. *Montgomery County Board of Education,* with directions to affirm the judgment of the District Court, 395 U. S. 225 (1969).[9] Certainly, the city's officials were aware of this order and were responsible for seeing that no actions on their part would significantly impede the progress of school desegregation in the city. *Cooper* v. *Aaron,* 358 U. S. 1 (1958); *Green* v. *County School Board of New Kent County,* 391 U. S., at 437–438; *Alexander* v. *Holmes County Board of Education,* 396 U. S. 19, 20 (1969). Any arrangement, implemented by state officials at any level, which significantly tends to perpetuate a dual school system, in whatever manner, is constitutionally impermissible. "[T]he constitutional rights of children not to be discriminated against . . . can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.'" *Cooper* v. *Aaron,* 358 U. S., at 17. This means that any tangible state assistance, outside the generalized services government might provide to private segregated schools in common with other schools, and with all citizens, is consti-

---

[9] Petitioners also requested that the District Court in this case take notice of *Carr* v. *Montgomery County Board of Education, supra.* The trial court in its reported opinion, 337 F. Supp., at 24, referred to the duty of the State's school boards to desegregate.

tutionally prohibited if it has "a significant tendency to facilitate, reinforce, and support private discrimination." *Norwood* v. *Harrison,* 413 U. S. 455, 466 (1973). The constitutional obligation of the State "requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination." *Id.,* at 467.

Here, the city's actions significantly enhanced the attractiveness of segregated private schools, formed in reaction against the federal court school order, by enabling them to offer complete athletic programs. The city's provision of stadiums and recreational fields resulted in capital savings for those schools and enabled them to divert their own funds to other educational programs. It also provided the opportunity for the schools to operate concessions that generated revenue. We are persuaded, as were both the District Court and the Court of Appeals, that this assistance significantly tended to undermine the federal court order mandating the establishment and maintenance of a unitary school system in Montgomery. It therefore was wholly proper for the city to be enjoined from permitting exclusive access to public recreational facilities by segregated private schools and by groups affiliated with such schools.

B

Although the Court of Appeals ruled out the *exclusive* use of city facilities by private schools, it went on to modify the District Court order "to make clear that the City of Montgomery is not prohibited'from permitting nonexclusive access to public recreational facilities and general government services by private schools or school affiliated groups," 473 F. 2d, at 840, or from permitting access to these facilities by private organizations that have a racially discriminatory admissions policy. *Id.,* at 839.

Upon this record, we are unable to draw a conclusion as to whether the use of zoos, museums, parks, and other recreational facilities by private school groups in common with others, and by private nonschool organizations, involves government so directly in the actions of those users as to warrant court intervention on constitutional grounds.

It would be improper to determine at this stage the appropriateness of further relief in all the many and varied situations where facilities are used in common by school groups or used exclusively or in common by private groups. It is possible that certain uses of city facilities will be judged to be in contravention of the parks desegregation order or the school desegregation order, or in some way to constitute impermissible "state action" ascribing to the city the discriminatory actions of the groups. The record before us does not contain sufficient facts upon which to predicate legal judgments of this kind. The questions to be resolved and the decisions to be made rest upon careful identification of the different types of city facilities that are available and the various uses to which they might be put by private groups.[10]

---

[10] The Brethren in concurrence state that they would sustain the District Court insofar as any school-sponsored or school-directed uses of the city recreational facilities enable private segregated schools to duplicate public school operations at public expense. It hardly bears repetition that the District Court's original injunction swept beyond these limits without the factfinding required for the prudent use of what would otherwise be the raw exercise of a court's equitable power.

It is by no means apparent, as our Brother BRENNAN correctly notes, which uses of city facilities in common with others would have "a significant tendency to facilitate, reinforce, and support private discrimination." *Norwood* v. *Harrison,* 413 U. S. 455, 466 (1973). Moreover, we are not prepared, at this juncture and on this record, to assume the standing of these plaintiffs to claim relief against certain nonexclusive uses by private school groups. The

The difficulties that confront us on this record are readily apparent. Under appropriate circumstances, the District Court might conclude, as it did in the instance of exclusive use by private schools, that access in common to city facilities by private school groups would indeed contravene the school desegregation order. For example, all-white private school basketball teams might be invited to participate in a tournament conducted on public recreational facilities with desegregated private and public school teams. Because "discriminatory treatment exerts a pervasive influence on the entire educational process," *Norwood* v. *Harrison,* 413 U. S., at 469, citing *Brown* v. *Board of Education,* 347 U. S. 483 (1954), such assistance, although proffered in common with fully desegregated groups, might so directly impede the progress of court-ordered school desegregation within the city that it would be appropriate to fashion equitable relief "adjusting and reconciling public and private needs." *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955). The essential finding justifying further relief would be a showing of direct impairment of an outstanding school desegregation order. *Cooper* v. *Aaron,* 358 U. S., at 17; *Bush* v. *Orleans Parish School Board,* 364 U. S. 500 (1960); *Brown* v. *South Carolina State Board of Education,* 296 F. Supp. 199 (SC), aff'd, 393 U. S. 222 (1968); *Poindexter* v.

---

plaintiffs in *Norwood* were parties to a school desegregation order and the relief they sought was directly related to the concrete injury they suffered. Here, the plaintiffs were parties to an action desegregating the city parks and recreational facilities. Without a properly developed record, it is not clear that every nonexclusive use of city facilities by school groups, unlike their exclusive use, would result in cognizable injury to these plaintiffs. The District Court does not have carte blanche authority to administer city facilities simply because there is past or present discrimination. The usual prudential tenets limiting the exercise of judicial power must be observed in this case as in any other.

*Louisiana Financial Assistance Comm'n,* 275 F. Supp. 833 (ED La. 1967), aff'd, 389 U. S. 571 (1968); *Lee v. Macon County Board of Education,* 267 F. Supp. 458 (MD Ala.), aff'd, *sub nom. Wallace v. United States,* 389 U. S. 215 (1967); *Norwood v. Harrison, supra.*

Relief would also be appropriate if a particular use constitutes a vestige of the type of state-sponsored racial segregation in public recreational facilities that was prohibited in the parks decree and likewise condemned in *Watson v. Memphis,* 373 U. S. 526 (1963). See also *Dawson v. Mayor and City Council of Baltimore,* 220 F. 2d 386 (CA4), aff'd, 350 U. S. 877 (1955); *Muir v. Louisville Park Theatrical Assn.,* 347 U. S. 971 (1954); *Holmes v. City of Atlanta,* 350 U. S. 879 (1955); *New Orleans City Park Improvement Assn. v. Detiege,* 358 U. S. 54 (1958). For example, the record contains indications that there are all-white private and all-Negro public Dixie Youth and Babe Ruth baseball leagues for children, all of which use city-provided ballfields and lighting, balls, bats, mitts, and other aid. Were the District Court to determine that this dual system came about as a means of evading the parks decree, or of serving to perpetuate the separate-but-equal use of city facilities on the basis of race, through the aid and assistance of the city, further relief would be appropriate.

The problem of private group use is much more complex. The Court of Appeals relied on *Moose Lodge No. 107 v. Irvis,* 407 U. S. 163 (1972), in concluding that the use of city facilities by private clubs did not reflect a "symbiotic relationship" between government and those groups so as to constitute state action. 473 F. 2d, at 838–839.

We feel that *Moose Lodge* is not fully applicable here. In that case, we generally followed the approach taken

in *Burton* v. *Wilmington Parking Authority, supra,* where it was stated:

> "Owing to the very 'largeness' of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present." 365 U. S., at 725–726.

In *Moose Lodge* the litigation was directly against a private organization, and it was alleged that the organization's racially discriminatory policies constituted state action. We held that there was no state action in the mere fact that the fraternal organization's beverage bar was licensed and regulated by the State. In contrast, here, as in *Burton,* the question of the existence of state action centers in the extent of the city's involvement in discriminatory actions by private agencies using public facilities, and in whether that involvement makes the city "a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U. S., at 725. Because the city makes city property available for use by private entities, this case is more like *Burton* than *Moose Lodge.* The question then is whether there is significant state involvement in the private discrimination alleged. *Reitman* v. *Mulkey,* 387 U. S. 369 (1967); *Burton* v. *Wilmington Parking Authority, supra; Evans* v. *Newton,* 382 U. S. 296 (1966); *Moose Lodge No. 107* v. *Irvis, supra.* "The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever."

407 U. S., at 173. Traditional state monopolies, such as electricity, water, and police and fire protection—all generalized governmental services—do not by their mere provision constitute a showing of state involvement in invidious discrimination. *Norwood* v. *Harrison,* 413 U. S., at 465; *Moose Lodge No. 107* v. *Irvis,* 407 U. S., at 173. The same is true of a broad spectrum of municipal recreational facilities: parks, playgrounds, athletic facilities, amphitheaters, museums, zoos, and the like. Cf. *Evans* v. *Newton,* 382 U. S., at 302. It follows, therefore, that the portion of the District Court's order prohibiting the mere use of such facilities by *any* segregated "private group, club or organization" is invalid because it was not predicated upon a proper finding of state action.

If, however, the city or other governmental entity rations otherwise freely accessible recreational facilities, the case for state action will naturally be stronger than if the facilities are simply available to all comers without condition or reservation. Here, for example, petitioners allege that the city engages in scheduling softball games for an all-white church league and provides balls, equipment, fields, and lighting. The city's role in that situation would be dangerously close to what was found to exist in *Burton,* where the city had "elected to place its power, property and prestige behind the admitted discrimination." 365 U. S., at 725. We are reminded, however, that the Court has never attempted to formulate "an infallible test for determining whether the State . . . has become significantly involved in private discriminations" so as to constitute state action. *Reitman* v. *Mulkey,* 387 U. S., at 378. " 'Only by sifting facts and weighing circumstances' on a case-by-case basis can a 'nonobvious involvement of the State in private conduct be attributed its true significance.' " *Ibid.,* quoting *Burton,* 365 U. S., at 722. This is the task for the District Court on remand.

## III

We close with this word of caution. It should be obvious that the exclusion of any person or group—all-Negro, all-Oriental, or all-white—from public facilities infringes upon the freedom of the individual to associate as he chooses. MR. JUSTICE DOUGLAS emphasized this in his dissent, joined by MR. JUSTICE MARSHALL, in *Moose Lodge.* He observed: "The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires." 407 U. S., at 179–180. The freedom to associate applies to the beliefs we share, and to those we consider reprehensible. It tends to produce the diversity of opinion that oils the machinery of democratic government and insures peaceful, orderly change. Because its exercise is largely dependent on the right to own or use property, *Healy* v. *James,* 408 U. S. 169, 181–183 (1972), any denial of access to public facilities must withstand close scrutiny and be carefully circumscribed. Certainly, a person's mere membership in an organization which possesses a discriminatory admissions policy would not alone be ground for his exclusion from public facilities. Having said this, however, we must also be aware that the very exercise of the freedom to associate by some may serve to infringe that freedom for others. Invidious discrimination takes its own toll on the freedom to associate, and it is not subject to affirmative constitutional protection when it involves state action. *Norwood* v. *Harrison,* 413 U. S., at 470.

The judgment of the Court of Appeals is therefore reversed in part. The case is remanded to that court

with directions to remand it in turn to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

Although I am in general agreement with the views expressed in my Brother WHITE's opinion, I wish to address certain other considerations which I believe should govern appellate review of the order entered by the District Court in this case. That court, which has an unfortunately longstanding and by now intimate familiarity with the problems presented in this case, issued the supplemental relief at issue here in response to a motion by petitioners bringing to its attention the practice of the city of Montgomery of allowing private schools and clubs with racially discriminatory admissions policies or with segregated memberships to use football facilities maintained at city expense. For all that appears in the record, this practice, and the related practice of allowing private segregated schools and clubs to use baseball fields, basketball courts, and athletic equipment maintained and purchased at city expense, were the only problems before the District Court and the only problems intended to be cured by its supplemental order.

Both the Court of Appeals and this Court, rather than limiting their review of the order in conformity with its intended scope, have sought to project the order to a wide variety of problems not before the District Court— including so-called nonexclusive access by private school groups or nonschool organizations to zoos, museums, parks, nature walks, and other similar municipal facilities—and to review the order as so projected.

By rendering an advisory opinion on matters never presented to the District Court, the Court of Appeals

and this Court have attempted to solve in the abstract problems which, in my view, should more appropriately be entrusted in large measure to the sound discretion of the District Court Judge who has lived with this case for so many years and who has a much better appreciation both of the extent to which these other matters are actual problems in the city of Montgomery and of the need for injunctive relief to resolve these problems to the extent they exist.

Since I find the District Court's order a permissible and appropriate remedy for the instances of unconstitutional state action brought to its attention, I would sustain and reinstate its order in its entirety.

Mr. Justice Brennan, concurring in the judgment.

The Court today affirms the Court of Appeals' judgment insofar as it affirmed paragraphs 1 and 2 of the District Court's order, *ante,* at 563–564, n. 6, as applied to enjoin respondents from permitting private segregated *school* groups to make "exclusive use" of Montgomery's recreational facilities. Unlike the Court, I do not think that remand is required for a determination whether certain "nonexclusive uses" by segregated *school* groups should also be proscribed, for I would also sustain paragraphs 1 and 2 insofar as they enjoin any school-sponsored or school-directed uses of the city recreational facilities that enable private segregated schools to duplicate public school operations at public expense.

*Norwood* v. *Harrison,* 413 U. S. 455 (1973), struck down a state program which loaned textbooks to students without regard to whether the students attended private schools with racially discriminatory· policies. Finding that free textbooks, like tuition grants to private school students, were a "form of financial assistance inuring to the benefit of the private schools themselves," *id.,* at 464,

*Norwood* held that the State could not, consistent with the Equal Protection Clause, grant aid that had "a significant tendency to facilitate, reinforce, and support private discrimination." *Id.,* at 466. The reasoning of *Norwood* compels the conclusion that Montgomery must be enjoined from providing any assistance which financially benefits Montgomery's private segregated *schools,* except, of course, "such necessities of life as electricity, water, and police and fire protection," *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 173 (1972). The unconstitutionality is thus obvious of such "nonexclusive uses" of municipal recreational facilities as the use of a portion of a park for a segregated school's gym classes or organized athletic contests. By making its municipal facilities available to private segregated schools for such activities, Montgomery unconstitutionally subsidizes its private segregated schools by relieving them of the expense of maintaining their own facilities.

Whether it is necessary to go even further and enjoin all school-sponsored and school-directed nonexclusive uses of municipal recreational facilities—as would my Brothers WHITE and DOUGLAS—is a question I would have the District Judge decide on remand. Private segregated schools are not likely to maintain their own zoos, museums, or nature walks. Consequently, permitting segregated schools to take their students on field trips to city facilities of that kind would not result in a direct financial benefit to the schools themselves. An injunction against use by segregated schools of such city facilities would be appropriate, in my view, only if the District Court should find that the relief is necessary to insure full effectuation of the Montgomery desegregation decrees.

I agree with the Court's vacation of the Court of Appeals' judgment reversing paragraphs 3 and 4 of the District Court's order relating to segregated *nonschool* groups,

and with the direction to the Court of Appeals to enter a new judgment remanding the case to the District Court for further proceedings as to *nonschool* groups. A remand is required, in my view, because first the District Court must consider whether, for purposes of relief supplementary to the 1959 parks desegregation decree, a distinction between simply all-white groups and all-white groups with a segregated admissions policy is proper, *ante,* at 563–564, n. 6, and second, if that distinction is found meaningful, the District Court must clarify what evidence was relied upon to conclude that private organizations with racially discriminatory admissions policies are in fact using municipal facilities.*

---

*My examination of the record reveals: On December 1, 1971, the parties had filed an "Agreement for Submission of Case," reciting that they agreed "for the case to be submitted to the Court on the pleadings filed by the parties, the answers to interrogatories heretofore filed by the parties, the answers to interrogatories heretofore filed by the Defendants, and upon the Fact Stipulation as attached hereto." The only interrogatories propounded in connection with the "Motion for Further Relief," with which this action was commenced, were propounded to respondent Henry M. Andrews, Director of the Parks and Recreation Department, and neither his answers nor anything contained in the Fact Stipulation, addresses a practice of respondents with respect to the use of facilities by nonschool private clubs and groups. There is, however, testimony on that subject in the depositions of the several respondents taken in an earlier proceeding on the amended complaint that had led to a settlement agreement. Testimony as to the use of facilities by an allegedly private segregated citywide Dixie Youth baseball league appears in the depositions of Joseph E. Marshall and Durwood Lynn Bozeman, the City's Athletic Director. Mr. Marshall's deposition states that, while the Dixie Youth teams at one time were officially segregated, they removed racial restrictions a number of years ago "realizing that many of [the] Leagues used municipal facilities" and that invitations to join the leagues are issued to all children in the public schools, though all of the directors of the leagues are white. Mr. Bozeman's deposition testifies that the city supplies these leagues

But, should the District Court on remand find adequate evidence of use of the city's recreational facilities by private *nonschool* groups with segregated admissions policies, or find that the distinction between such groups and simply all-white groups is improper, I believe that the District Court must enjoin "exclusive use" of recreational facilities by such groups. The complete record compiled in this case establishes beyond question that, even after the parks desegregation order of September 9, 1959, respondents continued for over a decade to engage in an unconstitutional *de jure* policy of deliberate segregation of the city's recreational facilities. The Court's reasoning in affirming the Court of Appeals' injunction against "exclusive use" of municipal recreational facilities by private segregated *school* groups demonstrates this and bears repetition:

> "[T]he city's policy of allocating facilities to segregated private schools, in the context of the 1959 parks desegregation order and subsequent history, created, in effect, 'enclaves of segregation' and deprived petitioners of equal access to parks and recreational facilities. The city was under an affirmative constitutional duty to eliminate every 'custom, practice, policy or usage' reflecting an 'impermissible obeisance to the now thoroughly discredited doctrine of "separate but equal." '... This obviously meant that discriminatory practices in Montgomery parks and recreational facilities were to be eliminated 'root and branch,' to use the phrase employed in *Green* v.

with playing facilities, pays for lighting, and gives each of them a dozen balls, chest protectors, leg guards, masks, mitts, and eight bats. Mr. Bozeman's deposition also covers the operations of the private, allegedly predominantly white, Babe Ruth league and a public Negro Babe Ruth league, and discusses the operations of allegedly segregated church softball leagues.

*County School Board of New Kent County,* 391 U. S. 430, 438 (1968)." *Ante,* at 566–567.

Surely, respondents' failure to extirpate "enclaves of segregation" created by "exclusive use" of city recreational facilities by private *nonschool* groups is no less a violation of the city's affirmative duty to desegregate the parks than its proved failure to eliminate "enclaves" created by the "exclusive use" of such facilities by *school* groups. Thus, unlike the Court, I see no reason for deferring an immediate expression on the significance of the city's involvement in the private discrimination of the nonschool groups, see *ante,* at 574, pending a more fully developed factual record. The justifications for finding that "exclusive use" by *school* groups violated the 1959 parks desegregation order plainly also require that, if private *nonschool* groups are in fact making "exclusive use" of municipal facilities, these uses, too, be found to violate the 1959 decree. In that circumstance, the unconstitutional "state action" of the respondents consists of their continuing racially discriminatory policies and practices that frustrate and impede the dismantlement of Montgomery's *de jure* segregated parks.

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS joins, concurring in the judgment.

I concur in the Court's judgment except that I would sustain the District Court not only to the extent the Court of Appeals affirmed its judgment but also insofar as it would bar the use of city-owned recreation facilities by students from segregated schools for events or occasions that are part of the school curriculum or organized and arranged by the school as part of its own program. I see no difference of substance between this type of use and the exclusive use that the majority agrees may not be permitted consistent with the Equal Protection Clause.

It may be useful also to emphasize that there is very plainly state action of some sort involved in the leasing, rental, or extending the use of scarce city-owned recreation facilities to private schools or other private groups. The facilities belong to the city, an arm of the State; the decision to lease or otherwise permit the use of the facilities is deliberately made by the city; and it is fair to assume that those who enter into these transactions on behalf of the city know the nature of the use and the character of the group to whom use is being extended. For Fourteenth Amendment purposes, the question is not whether there is state action, but whether the conceded action by the city, and hence by the State, is such that the State must be deemed to have denied the equal protection of the laws. In other words, by permitting a segregated school or group to use city-owned facilities, has the State furnished such aid to the group's segregated policies or become so involved in them that the State itself may fairly be said to have denied equal protection? Under *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961), it is perfectly clear that to violate the Equal Protection Clause the State itself need not make, advise, or authorize the private decision to discriminate that involves the State in the practice of segregation or would appear to do so in the minds of ordinary citizens.