515 F.2d 1082
 Michael C. McCRARY, infant by Curtis L. McCrary and Sandra
McCrary and Colin M. Gonzales, infant by Raymond
Gonzales and Margaret R. Gonzales, Appellees,
v.
Russell L. RUNYON and Katheryne E. Runyon, Defendants,
Southern Independent School Association, Appellant.
Michael C. McCRARY, infant by Curtis L. McCrary and Sandra
McCrary and ColinM. Gonzales, infant by Raymond
Gonzales and Margaret R. Gonzales, Appellees,
v.
Russell L. RUNYON and Katheryne E. Runyon, Appellants,
Southern Independent School Association, Defendant.
Michael C. McCRARY, infant by Curtis L. McCrary and Sandra
McCrary,Plaintiffs,
and
Colin M. Gonzales, infant by Raymond Gonzales and Margaret
R. Gonzales, Appellants,
v.
Russell L. RUNYON, Katheryne E. Runyon and Southern
Independent SchoolAssociation, Appellees.
Colin M. GONZALES, infant by his parents, Raymond Gonzales
and Margaret R.Gonzales, Appellees,
v.
FAIRFAX-BREWSTER SCHOOL, INC., Appellant.
Colin M. GONZALES, infant by his parents, Raymond Gonzales
and Margaret R.Gonzales, Appellants,
v.
FAIRFAX-BREWSTER SCHOOL, INC., Appellee.
 Nos. 73-2348 to 73-2352.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 2, 1974.
Decided April 15, 1975.
Rehearing Denied May 29, 1975.
 
 George S. Leonard, Washington, D. C., and Louis Koutoulakos, Arlington, Va., for appellants in Nos. 73-2348, 73-2349 and 73-2350.
 Andrew A. Lipscomb, Washington, D. C. (Gary R. Sheehan and Tolbert, Lewis & Fitzgerald, Arlington, Va., on brief), for appellants/cross-appellees in Nos. 73-2351 and 73-2352.
 Thomas J. Schwab, Washington, D. C., on brief for amici curiae in Nos. 73-2348, 73-2349 and 73-2351.
 Allison W. Brown, Jr., Washington, D. C. (Robert M. Alexander, Arlington, Va. and Roderick V. O. Boggs, Washington, D. C., on brief), for appellees/cross-appellants in Nos. 73-2348, 73-2349, 73-2350, 73-2351 and 73-2352.
 Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, DONALD RUSSELL, FIELD and WIDENER, Circuit Judges, sitting en banc.
 HAYNSWORTH, Chief Judge:
 
 
 1
 The issue in this case is whether 42 U.S.C.A. § 1981[1] prohibits private schools from denying admission to qualified black applicants solely on the basis of their race.
 
 
 2
 This appeal is a consolidation of two suits initiated by parents of black children who claim that they were denied admission to the appellant schools because of their race.
 
 
 3
 The Southern Independent School Association intervened in these actions, alleging that it is an association representing over 300 private, non-profit schools in the South, some of which concededly are racially exclusive in their admission policies. The position of the intervenor is simply that racial discrimination by private schools is not prohibited by § 1981, and, in any event, cannot be constitutionally prohibited.
 
 I.
 
 4
 As found by the trial judge, in early May 1969, the parents of Colin Gonzales contacted the Fairfax-Brewster School, a private school located in Fairfax County, Virginia, about enrolling their son in the school's summer day camp program, and continuing into the first grade in the fall. The Gonzales' learned of Fairfax-Brewster through a mass mailing addressed to "Resident," an advertisement in the Yellow Pages in the telephone book, and from a friend whose son attended the Summer Camp.
 
 
 5
 Thereafter, the Gonzales visited the school and, being pleased with what they saw, completed an application for their son. They also furnished, as required, a medical certificate and application fee. On May 16, 1969, the medical certificate and application fee were returned, accompanied by a form letter stating that the school was "unable to accommodate the application." No further explanation was given.
 
 
 6
 Mr. Gonzales called the school and spoke with someone who identified himself as Captain Reiss. In response to Mr. Gonzales' inquiry as to why his son's application was rejected, he was told that the school was not integrated.
 
 
 7
 Captain Reiss is the Chairman of the Board of Fairfax-Brewster School. His son, Robert, is the Administrative Director, and his daughter-in-law Olga is the Registrar.
 
 
 8
 Both Captain Reiss and his son deny any such conversation. They testified that Colin, age 51/2, was rejected because they felt that the kindergarten he had previously attended gave Colin insufficient preparation for the first grade at Fairfax-Brewster. Because they found Colin unqualified for the first grade, the Reisses concluded that "there was no point" in allowing him to enter the summer camp only to have to "yank him out" at the beginning of the academic year.
 
 
 9
 Subsequent to their son's rejection from Fairfax-Brewster, the Gonzales telephoned Bobbe's School, and were told that only members of the Caucasian race were accepted.
 
 
 10
 In August 1972, Mrs. McCrary called Bobbe's School about enrolling her two year old son, Michael, in the nursery school. She asked whether the school was integrated and accepted blacks, and was told it did not. She did not file a formal application with Bobbe's.
 
 
 11
 Mr. Gates, the superintendent of Bobbe's, testified that he never received a call from either the Gonzales or Mrs. McCrary. He testified that the school does not discriminate on the basis of race, although he said that no black child had ever applied.
 
 
 12
 The district court found the testimony of the Reisses "unbelievable," and concluded that Colin had been rejected from Fairfax-Brewster because of his race. He further found that both the Gonzales and Mrs. McCrary had called Bobbe's and had been told that the school would not accept blacks. It held that "(i)t is of no moment that no formal application was filed. It would be ridiculous to require this of the plaintiffs after they had effectively been told it was useless."
 
 
 13
 Accordingly, the court concluded that the appellant schools practiced racial discrimination in their admissions policies.
 
 
 14
 On the authority of Jones v. Alfred H. Mayer Co. 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) and Tillman v. Wheaton-Haven Recreation Assn., 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973), it held that § 1981 prohibits racial discrimination in private contractual arrangements, even when there is no state involvement. Therefore, it held that the schools were in violation of § 1981 in their admissions policies, and permanently enjoined defendants and intervenors from discriminating against blacks in enrollment in their schools. In addition, it awarded damages for embarrassment, humiliation and mental anguish to Colin, Michael and Michael's parents, and attorney's fees against Fairfax-Brewster and Bobbe's. Gonzales v. Fairfax-Brewster School, Inc., 363 F.Supp. 1200 (E.D.Va.1973).
 
 
 15
 Defendants and intervenor appeal. We affirm the injunction and the award of damages, but reverse the award of attorney's fees.
 
 II.
 
 16
 Initially, the appellants contest the district court's findings of facts, urging that the district court was clearly erroneous in concluding that Fairfax-Brewster and Bobbe's practice racial discrimination.
 
 
 17
 There was conflicting testimony as to whether the Gonzales had been told that Fairfax-Brewster was not integrated and whether both the McCrarys and Gonzales were told that Bobbe's was not integrated. Resolution of this conflict depended upon the district court's evaluation of the credibility of the witnesses. We may not reverse a trier of fact, who had the advantage of hearing the testimony, on a question of credibility.
 
 
 18
 In addition, the testimony of the black parents was corroborated and supported by the testimony of two other witnesses. Mrs. Bryant testified that she had telephoned Fairfax-Brewster and Bobbe's to inquire about their admissions policies and was told that the schools were not integrated. Mr. Brooks, Mrs. McCrary's supervisor at her job, testified that a Mr. Gates, at Bobbe's, told him, over the telephone, that Bobbe's did not accept blacks.
 
 
 19
 The trial judge also thought that the Reiss's story that Colin was rejected on educational rather than racial grounds was undercut by the fact that Fairfax-Brewster allows applicants to take an entrance examination when previous scholastic preparation is inadequate. Colin was not given this opportunity.
 
 
 20
 In short, there is ample evidence in the record to support the trial judge's factual determinations, and we are unable to say that, viewing the record as a whole, he was clearly erroneous in concluding that Colin and Michael were denied admission to the schools because of their race.
 
 III.
 
 21
 The substantive legal questions, which have been the subject of varied comment in the literature,[2] we think were correctly resolved by the district court. Section 1981 is a limitation upon private discrimination, and its enforcement in the context of this case is not a deprivation of any right of free association or of privacy of the defendants, of the intervenor, or of their pupils or patrons.
 
 A.
 
 22
 It may once have been supposed that § 1981 served only the limited office of removing legal disabilities which state statutes imposed upon black people. It, of course, did cancel state statutes which imposed restrictions upon the right of blacks to contract, but the Supreme Court has clearly held that it did much more than that. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386; Tillman v. Wheaton-Haven Recreational Assn., 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973).
 
 
 23
 In Jones v. Mayer, the Court was concerned with the right to purchase real estate. There a real estate developer had refused to sell a residence in a "white area" to the black plaintiff. Analyzing the text and legislative history of § 1 of the Civil Rights Act of 1866,[3] the Court held that § 1982 applied to purely private activity and provided a judicial remedy. As so construed, it was held that enactment of § 1982 was a valid exercise of the power of Congress under the enforcement clause of the Thirteenth Amendment, which gave Congress power to "pass all laws necessary and proper for abolishing all badges and incidents of slavery."[4] The Court concluded that, unlike the Fourteenth Amendment, the Thirteenth reached private conduct in which no state action was involved.
 
 
 24
 As an intellectual exercise, the historical reading and interpretation of the majority in Jones v. Mayer may be debatable. See VI History of the Supreme Court of the United States; Fairman Reconstruction and Reunion, 1207 et seq. That reading and interpretation was followed in Sullivan v. Little Hunting Park and in Tillman v. Wheaton-Haven, however, and, for us, is firmly established.
 
 
 25
 Jones v. Mayer, of course, dealt with § 1982, assuring the right to purchase property. We deal with § 1981, assuring the right to contract, but both sections derive from § 1 of the Civil Rights Act of 1866. Both are subject to the same analysis and must be interpreted in the same light. In Tillman v. Wheaton-Haven, the claim of the guest and the host rested upon § 1981. The Supreme Court expressly noticed the relation between § 1981 and § 1982, their common derivation from § 1 of the Civil Rights Act of 1866 and the necessity of according them similar interpretation.
 
 
 26
 It is contended here, however, that § 1981 confers no right of action unless the contract denied the aggrieved person was open to all white people. It seems obvious that the relationship between the school on the one hand and a pupil and his parents on the other hand is a contractual one and that admission is a part of the process of forming such a contractual arrangement. It is also true that admission to the school is not open to all white people because there are academic, financial and other restrictions upon admission. Within the qualified class, however, there is no other limitation upon the admission of white applicants up to the school's capacity.
 
 
 27
 We may not read § 1981 so restrictively as the schools would have us to do it. The school may not refuse with impunity to accept an otherwise qualified black applicant simply because it declines to admit unqualified white applicants. The section is violated by the school as long as the basis of exclusion is racial, for it is then clear that the black applicant is denied a contractual right which would have been granted to him if he had been white.
 
 
 28
 What we have said should not be read to call into question the right of the school to insist upon an evenhanded requirement of academic and other racially neutral qualifications. Indeed, the right of the school to be selective on those bases is unquestioned here. All that is contended and all that we hold is that § 1981 prohibits the rejection of a black applicant when his qualifications meet all other requirements and race is the only basis for his rejection.
 
 B.
 
 29
 As applied here, we see no violation of any constitutionally protected rights of free association and of privacy.
 
 
 30
 There is a protected right of free association. As stated by the Supreme Court in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of * * * freedom of speech." Id. at 460, 78 S.Ct. at 1171. The constitutional protection, however, is essentially an attribute of First Amendment rights and would not ordinarily justify exclusion of others sharing the same beliefs and ideas. Here, at least, there is no showing that discontinuance of their discriminatory admission practices would inhibit in any way the teaching in these schools of any ideas or dogma.
 
 
 31
 Nothing in § 1981 impedes parents in their exercise of a choice of a private school presenting ideas or having educational methods or practices which are not available in the public schools. They may do the same thing to avoid ideas and influences in the public schools which they regard as unhealthy. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Among private schools, they are free to prefer one with a certain curriculum or dogma over others, but the school, while it may exclude applicants on the basis of neutral principles, may not exclude on the basis of race.
 
 
 32
 There is also a right of privacy. Its constitutional basis may be elusive, but it has clearly been held to exist. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
 
 
 33
 Though certain intimate and private affairs of men and women are protected from governmental interference, the schoolhouse is far from the realm of protection. The right is appropriately recognized in certain instances when only a few people are involved in activity unintended for the public view. In such instances, it is more than likely or inevitable that there is some plan or purpose of exclusiveness other than race. When relations between husband and wife are involved, their purpose to exclude all the rest of the world has no racial connotations. When a school holds itself open to the public, however, or even to those applicants meeting established qualifications, there is no perceived privacy of the sort that has been given constitutional protection.
 
 
 34
 Indeed, § 1981 does not purport to reach all private associations. It reaches only those which evidence "no plan or purpose of exclusiveness" other than race. Sullivan v. Little Hunting Park, supra. Private associations having non-racial criteria for the selection of members may apply their criteria, even if it results in a disproportionate impact upon the members of one race. It is only when blacks are excluded because they are black, or denied a right to contract which would be granted were they white, that § 1981 is violated.
 
 
 35
 Nor do we read anything in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), as holding that rights of association or rights of privacy, or both combined, prevent the application of § 1981 here. In Norwood the Supreme Court struck down a Mississippi statute giving free textbooks to all students, including those attending private, segregated schools. Mississippi contended that its failure to furnish free textbooks to students in private, segregated schools would violate the equal protection clause and would undermine the right of the parents to send their children to private schools. In answer, the Court observed that because "the Constitution may compel tolerance of private discrimination in some circumstances does not mean that it requires state support for such discrimination." 413 U.S. at 463, 93 S.Ct. at 2809.
 
 
 36
 The observation in Norwood is far from a holding that segregation in a private school is constitutionally protected. Earlier in the opinion the Court had observed that no such question was presented. 413 U.S. at 457, 93 S.Ct. 2804. Nor are we met with the question whether segregation in private schools is itself a violation of the Thirteenth or Fourteenth Amendment. We deal with a specific statute passed in implementation of the Thirteenth Amendment. See Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); Note, Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments, 74 Colum.L.Rev. 449 (1974).
 
 
 37
 Finally, the Court in Norwood recognized the thrust of § 1981 and § 1982 when it noted that private discrimination "has never been accorded affirmative constitutional protections. And even some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment." 413 U.S. at 470, 93 S.Ct. at 2813. We deal with such circumstances. In short, we cannot read Norwood as a holding that segregation in private schools such as these is constitutionally protected so as to be beyond the reach of § 1981.
 
 C.
 
 38
 Some schools may be so private as to have a discernible rule of exclusivity which is inoffensive to § 1981. Should siblings combine to employ tutors for their children, they may exclude the rest of the world, for the rule of exclusivity bars the more distantly related and the unrelated regardless of race. The schools here are not private in that sense, and there is no discernible neutral rule of exclusivity which would bar these plaintiffs. The schools are private only in the sense that they are managed by private persons and they are not direct recipients of public funds. Their actual and potential constituency, however, is more public than private. They appeal to the parents of all children in the area who can meet their academic and other admission requirements. This is clearly demonstrated in this case by the public advertisements. Within that constituency, they may not exclude a black applicant, solely because of his race, while accepting white applicants with comparable qualifications.
 
 IV.
 
 39
 The district court awarded damages for embarrassment, humiliation and mental anguish suffered plus an award of attorney's fees. The schools complain of both.
 
 A.
 
 40
 It is not helpful to look to state decisions in personal injury tort cases in which damages for such injuries are denied.[5] That damages are recoverable for violations of §§ 1981 and 1982 is established by Sullivan v. Little Hunting Park, 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386, in which we are told, "both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes."
 
 
 41
 Section 1981 doubtless was intended to give to the former slaves access to opportunities for material betterment of themselves, but it was also intended to remove the stigma which accompanied the disabilities under which they formerly had labored. The plain command of the statutes is that those formerly enslaved henceforth shall be treated as having all of the rights and dignity of other people dwelling with them in a land of freedom. A denial of those statutory rights is treatment of the victim as being subject to those earlier disabilities. It is an affront, of which embarrassment and humiliation are natural consequences. If the statute is to be enforced fairly, if injuries suffered directly because of its violation are to be fairly compensated, damages for embarrassment and humiliation must be recoverable in a case such as this.
 
 B.
 
 42
 The award of attorney's fees stands in a different posture. It is one thing to award damages for the invasion of a legal right and quite another to impose all of the litigation costs on the defendant. Unlike damages, attorney's fees have been granted only in narrowly defined circumstances.
 
 
 43
 We have recognized the propriety of an award of fees when a party maintained his position in bad faith, displaying "obstinate obduracy." Brewer v. School Board of City of Norfolk, 4 Cir., 456 F.2d 943, 948-52. The district court, however, made no finding of "obstinate obduracy,"[6] and we can see no basis for such a finding. Since this suit involves a novel application of a recently revived statute, the litigation of the issues cannot be equated with the recalcitrance we found in Brewer. Although at trial the parties recounted different versions of the facts and the court accepted the plaintiffs' story, the finding suggests no bad faith or perjury. Faults in perception or memory often account for differing trial testimony, but that has not yet been thought a sufficient ground to shift the expense of litigation.
 
 
 44
 Attorney's fees, of course, are available where Congress has expressly authorized them. A conspicuous example is Title II of the 1964 Civil Rights Act.[7] Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Section 1981 never contained a provision for fees, and although the Emergency School Aid Act of 1972 expressly allows fees in suits to desegregate public or federally aided secondary or elementary schools,[8] plaintiffs have made no showing of federal aid to, or state action by, the defendants.
 
 
 45
 In the absence of expressed congressional direction, we are presented with the question whether to adopt a "private attorney general" theory. Although application of that theory may be proper in some actions based on the 1866 and 1870 Civil Rights Act, it would be inappropriate in this case. In considering an award of fees in an action based on the older civil rights statutes, we look to more recent congressional determinations that a policy is so important or public enforcement mechanisms are so ineffective that attorney's fees are necessary to promote private enforcement. Mere provision of a private cause of action is not sufficient. A statutory grant of attorney's fees in suits covering the same subject matter, however, would be a strong indication of such a congressional determination.
 
 
 46
 In Lee v. Southern Home Sites Corp., 5 Cir., 444 F.2d 143, Judge Wisdom looked to the enactment of the Fair Housing Law of 1968, which contained a fees section, 42 U.S.C. § 3612(c), in deciding that fees were available to a plaintiff seeking to redress racial discrimination in the sale of houses under § 1982. In 1968 Congress had acted, pursuant to its powers under the Thirteenth Amendment,[9] to prohibit discrimination in the sale of private housing.[10] In Lee's § 1982 action, he proceeded against precisely the discrimination that Congress had sought to curb by providing for an award of reasonable fees for his attorney to a prevailing plaintiff in a private enforcement action.
 
 
 47
 Employment discrimination suits provide another example of judicial allowance of fees under the older, more general civil rights statutes. We have recognized that a plaintiff under Title VII might recover attorney fees.[11] Reaching beyond Title VII, courts have allowed fees in actions brought under the older civil rights statutes to eliminate similar employment discrimination. Fowler v. Schwarzwalder, 8 Cir., 498 F.2d 143 (§§ 1981, 1983); Harper v. Mayor and City Council of Baltimore, D.Md., 359 F.Supp. 1187, 1218-19, modified on other grounds sub nom., Harper v. Kloster, 4 Cir., 486 F.2d 1134 (§§ 1981, 1983); Cooper v. Allen, 5 Cir., 467 F.2d 836 (§ 1981). In Cooper the plaintiff based his suit on racial discrimination in hiring by a municipal golf course, but he failed to go through the conciliation procedures of Title VII and could not proceed under the statute. Nevertheless, Congress had authorized fees in the similar Title VII action to encourage private elimination of such discrimination. Where plaintiffs advance precisely the same congressional goal by the use of a more general statute, they may be entitled to attorney's fees. That is not to say, however, that once fees are awarded in any § 1981 or § 1982 case, they should always be granted in actions based on those statutes. The focus of the inquiry should be whether the plaintiffs advanced a goal the attainment of which Congress sought to further by providing for the recovery by a prevailing plaintiff of his attorney's fees.
 
 
 48
 In this case the plaintiffs have not acted to foster a goal that Congress deemed so urgent. The Emergency School Aid Act spoke only to desegregation actions against public and federally aided schools. Unlike the Federal Housing Law or Titles II and VII of the 1964 Civil Rights Act, the statute does not aim to eliminate discrimination from a facet of private American life. The limitation in that statute to public schools is not merely a technical or procedural restriction, but goes rather to the substance of the congressional goal. Without some congressional direction, even by analogy, we will not award attorney's fees, but will adhere to the usual rule that prevailing plaintiffs may not recover their attorney's fees,[12] for we find none of the recognized exceptions applicable.[13]
 
 
 49
 Affirmed in part.
 
 
 50
 Reversed in part.
 
 
 51
 BUTZNER, Circuit Judge (concurring in part and dissenting in part):
 
 
 52
 I concur in Parts I, II, III, and IV-A of the opinion. I dissent from Part IV-B, which reverses the district court's allowance of attorneys' fees. I would adhere to our practice of sustaining a district judge who, for sound reasons, has allowed attorneys' fees. His discretion can be justified in this case on two grounds: the appellees acted as private attorneys general, and, alternatively, the appellants' defense was tainted by obdurate obstinacy.
 
 
 53
 By prosecuting this single case, the appellees invalidated the racially exclusive admission practices of over three hundred schools represented by the Southern Independent School Association, as well as the practices of Fairfax-Brewster and Bobbe Schools. In so doing, they vindicated congressional policy by abolishing an aspect of racial discrimination prohibited by the Civil Rights Act of 1866 (42 U.S.C. § 1981). This type of suit is encompassed by the private attorney general doctrine, which is applicable to suits brought under the Civil Rights Acts of 1866, 1871, and 1964. See, e. g., Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972); Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971); Sims v. Amos, 340 F.Supp. 691 (M.D.Ala., 3-judge court), aff'd mem., 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). Under this doctrine, the award is not dependent on proof of bad faith, for good or bad faith is irrelevant. Brandenburger v. Thompson, 494 F.2d 885, 888 (9th Cir. 1974). Nor does the receipt of compensatory damages preclude an award of attorneys' fees, Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972), though, of course, a court may take damages into account when awarding a fee. See Lee v. Southern Home Sites Corp., 444 F.2d at 147.
 
 
 54
 Alternatively, attorneys' fees are justified when defendants display obdurate obstinacy. See Brewer v. School Board of City of Norfolk, 456 F.2d 943 (4th Cir. 1972) (dictum). The district court's findings, amply supported by the record, demonstrate that the officers of the schools did not truthfully recount under oath the facts of the case. Such bad faith in the conduct of litigation is a pernicious form of obstinacy that can no more be tolerated than out-of-court bad faith. Cf. Hall v. Cole, 412 U.S. 1, 15, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). This behavior should not be excused simply because this case involves a novel factual situation. Cf. Lea v. Cone Mills Corp., 438 F.2d 86, 88 (4th Cir. 1971); Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 536 (5th Cir. 1970).
 
 
 55
 Finally, I believe that the enactment of 20 U.S.C. § 1617 directing the allowance of fees in public school desegregation cases does not create an inference that Congress intended to withdraw from district courts "the inherent equitable power"* of a chancellor to allow fees in actions against private schools when the facts otherwise justify the award because the plaintiffs acted as private attorneys general or the defendants displayed obdurate obstinacy. Other courts confronted with analogous problems have not restricted the allowance of fees in suits brought under the earlier Civil Rights Acts to instances where Congress has subsequently authorized fees in related legislation. See, e. g., Brandenburger v. Thompson, 494 F.2d 885 (9th Cir. 1974) (welfare benefits); Sims v. Amos, 340 F.Supp. 691 (M.D.Ala., three-judge court), aff'd mem., 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972) (reapportionment). Indeed, the drastic limitation on the allowance of fees in civil rights cases suggested by the majority appears to be without precedent.
 
 
 56
 Judge WINTER and Judge CRAVEN concur in Parts I, II, III, and IV-A of the court's opinion. They join Judge BUTZNER in dissenting from Part IV-B.
 
 
 57
 DONALD RUSSELL, FIELD and WIDENER, Circuit Judges (concurring and dissenting):
 
 
 58
 * We concur in the result reached in part IV-B of the opinion of the court. We would not, of course, reach the question of attorneys' fees if our view on the merits prevailed. Otherwise, we respectfully dissent.
 
 II
 
 59
 In its opening paragraph, the majority opinion correctly states the legal issue[1] in this case. We add, however, that the issue is presented to this court as one of first instance in any federal court at this or higher level.[2] We are bound by no definitive Supreme Court decision.
 
 
 60
 The majority regard Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), followed in Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), and Tillman v. Wheaton-Haven Recreational Association, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973), as being controlling precedents. We do not so regard those decisions.
 
 
 61
 We believe that the majority has been unduly impressed by the historical relationship between §§ 1981 and 1982 and has failed to discern the difference between the right to purchase real estate and the right to attend an independent school inferred from the right to "make and enforce contracts." The purchase of real estate, with its attending perquisites, is a commercial transaction pure and simple, and many other contracts are likewise purely commercial. On the other hand, the relationship of teacher and student is one of status, which is related to the contract concept in the same way that the status of husband and wife may be said to grow out of a contract of marriage. The contract aspect of the situation is minor and incidental and serves no purpose other than as a door opener in the present case to bring independent schools within the scope of § 1981. The right to make and enforce contracts does not imply a right to coerce an unwilling co-contractor into making any and every variety of contract.
 
 
 62
 The majority opinion also fails to recognize Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). True, those cases do not involve § 1981 or § 1982, but involve the problem of State action under the Fourteenth Amendment. However, they do show that answers to apparently the same type of technical questions in this field may vary according to the facts of each particular situation.
 
 
 63
 Legal problems arising out of a purpose to readjust interracial relationships fall into four categories: (1) those arising under the Fourteenth Amendment; (2) those created by the Civil Rights Acts of the 1960's; (3) those resulting from conditions imposed by the federal government upon benefits bestowed such as aids to education; and (4) those arising from the resurrection of the post Civil War Civil Rights Act of 1866 and the several acts of the 1870's, now found in 42 U.S.C.A. § 1981 et seq. Legal problems involving the issues regarding the newly enfranchised slaves were acute until the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Thereafter, such legal problems became stereotyped until the landmark decision in 1954 of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). That case introduced the first of the above four categories, which is still paramount. Racially discriminatory action may be struck down under the Fourteenth Amendment provided State action is involved. In the 1960's, the Congress forbade racially discriminatory practices under the Civil Rights Acts of 1964 and 1968. Those acts did not touch private action in some fields. To cover this hiatus, the post Civil War Civil Rights Acts were resurrected. The leading case is Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), which was decided after the passage of the Civil Rights Act of 1964.
 
 
 64
 After the Thirteenth Amendment abolished slavery in 1865, various States passed Black Codes designed to keep those who were newly enfranchised as second class citizens if citizens at all. Although such former slaves were now free, the objective was to keep them from exercising the legal rights usually associated with free citizenship such as the ownership of property and the making of contracts. See Private Discrimination, 74 Col.L.Rev. 450, 452 (1974). To counteract this movement, the Fourteenth and Fifteenth Amendments were eventually adopted. More immediately, however, the Civil Rights Act of 1866 was passed. It was based upon § 2, the enforcement section, of the Thirteenth Amendment which, unlike the Fourteenth Amendment, did not require State action. What is now 42 U.S.C.A. §§ 1981 and 1982 were section one of the Act of 1866. And there were misgivings as to the constitutionality of the Act. Simply, they were that the Thirteenth Amendment abolished slavery, and conduct, such as that prohibited by the 1866 Civil Rights Act, did not constitute the reestablishment of slavery in the strictest sense of the word. Because of the constitutional doubt just mentioned, the provisions of the Civil Rights Act of 1866 were reenacted, practically intact, in various statutes passed during the 1870's, after the effective date of the Fourteenth Amendment. Section One of the Act of 1866 was reenacted in 1870 and is now represented by 42 U.S.C.A. §§ 1981 and 1982. Only the 1866, and not the 1870, Act is here pertinent because State action is clearly not involved in our case. The Acts of 1866 and 1870 were dormant for so many years that in civil law countries a desuetude would have occurred.[3] Not until after the passage of the Civil Rights Act of 1964 was the 1866 Act reactivated. The 1964 Act made no attempt to prevent racial discrimination in the admission policies of independent schools. If the Thirteenth Amendment authorized Congress to forbid independent schools to use race as an admissions criterion in 1866, it likewise did so in 1964. Whatever the intent of the 1866 Congress may have been, it must be that the 1964 Congress did not intend to restrict the admissions policies of independent schools.
 
 
 65
 The application of 42 U.S.C.A. § 1981 to this case may be approached either as a matter of interpretation or as a matter of constitutionality: i. e., (1) what does § 1981 forbid? (2) is § 1981 constitutionally valid? Here, those two questions merge together. Section 1981, as any other statute, should be construed, in the light of constitutional limitations, to uphold its validity. See Graham v. Richardson, 403 U.S. 365, 382, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).[4]
 
 
 66
 While dissenting, we wish to make it clear that we do not necessarily express approval of the alleged restrictive admissions policies of the appellants. What is involved here is a collision between competing social interests, any of which, standing alone, would be regarded with favor.
 
 
 67
 On the one hand, our society has an interest in the upward mobility of all of its citizens, unhampered by invidious distinctions. A corollary of this is an interest in educational opportunities.
 
 
 68
 This interest in educational opportunity as a means of upward mobility is confronted by social interests in the true independence of private educational institutions, and in the right of voluntary association and non-association. Although the backbone of our educational system must of necessity be found in our public schools, in a diverse society such as ours the leavening value of educational institutions which are autonomous and free from control by the federal and state governments is generally and legally accepted. Compare Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Society has an interest in preserving the true independence of such institutions.
 
 
 69
 The other social interest which supports the position of appellants is the interest in free association. It is conceded that, as a general matter, enforced association is foreign to our institutions. Mr. Justice Douglas, in his dissenting[5] opinion in Moose, 407 U.S. stated at p. 179, 92 S.Ct. at 1974, the proposition thus:
 
 
 70
 "The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires."
 
 
 71
 Even were we to assume, for argument, the majority holding that the persuasiveness of the right of free association depends, in part at least, upon the size of the unit, both of the schools here involved are small. They are not huge and impersonal. The district court's opinion, 363 F.Supp. 1200, 1201, 1202, indicates a maximum enrollment at Fairfax-Brewster School of 236 and at Bobbe's School an average of 200. In schools of that size, intimacy of personal association is still important, and the right of free association certainly should apply, if it does in any case, to units of such numbers. How great a size, if any, might destroy the constitutional protection is a question not now before us.[6]
 
 
 72
 It is one of the missions of law to balance conflicting social interests so as to give the maximum of protection to each.[7] Which interest will prevail will depend therefore upon special considerations in each context in which the conflict is presented. A good illustration of this point is to be found in a comment upon the district court's decision in the instant cases in Segregation in Private Schools, 122 U.Penna.L.Rev. 471, at 478, 479 (1973). It is there stated that "a balancing of Constitutional interests is necessary to produce a proper construction of section 1981." The author continues:
 
 
 73
 "Our discussion to this point suggests where the balance might be struck without seriously impairing either right. The right to contract protected in section 1981 should be limited to contracts found in secondary, as contrasted with primary relationships. The former (sic, latter) are 'basically relationships between friends,' characterized by 'intimate association.' Secondary relationships, by contrast, are 'impersonal, highly formalized relations between people,' for example, the relationship between buyer and seller . . . under this approach, discrimination would be allowed in primary relationships for any reason whatever, including racial bias, . . ."
 
 
 74
 The article suggests that such a differentiation reconciles the results in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), and Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). If this approach is used, it seems to us that a secondary school as found here involves a primary relationship and thus is not within the scope of § 1981.
 
 
 75
 So far as the balancing of conflicting interests is concerned, the difference between the right to own property, under § 1982, and the alleged right to attend an independent school under § 1981 becomes apparent. The word "right" is ambiguous. See Private Discrimination, 74 Col.L.Rev. 449, at 468, 469 (1974). It may mean an immunity from legal disability to own property or make a contract. In Hohfeldian terms, this would be a privilege. Or it may mean a power to compel another to convey property or enter into contractual relations notwithstanding a refusal to do so solely because of race. It is not necessary to assume that the word right means the same in all contexts. If on the one hand we consider society's interest in upward mobility and the removal of invidious discrimination against disadvantaged groups, it would seem clear, as pointed out in the Columbia Law Review citation, supra, that a mere freedom from legal disability to own property would be of little value to a black person if prospective vendors could refuse to sell to him because of his race. There might be no other source from which he could purchase property. Thus, the Supreme Court's decision in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), can be readily understood and accepted, even were we not under obligation to accept and follow it.
 
 
 76
 The same basis of necessity is not available to support the desire of blacks to attend an all white independent school. The overwhelming portion of the burden of educating our people is borne by public schools, which by law are non-segregated. If all schools, nursery through college, are considered, in 1972, 86.6% attended public schools and only 13.4% attended non-public schools. If only secondary schools, which is what are involved in this case, be considered, statistics show that in 1972 92.4% of students attended public schools and only 7.6% attended non-public schools. (American Almanac for 1974, page 108). These statistics are the more significant when it is considered that more independent schools, including all or practically all church affiliated institutions, do not use race as a basis for admission. Thus, so far as acceptance as a first class citizen is dependent upon educational opportunity, the impact of schools such as those operated by the two appellants is diminutive. If it be asserted that the exclusionary policies of schools such as these appellants have invidious implications, it must be remembered that most, if not all, of the high prestige private schools, are not racially segregated. In fact, many of them make an affirmative effort to obtain black students. See Segregated Academies and State Action, 82 Yale L.Jour. 1436, at 1444 (1973). Indeed, at the time of the district court's decision in this case, appellee Colin Gonzales had been accepted by and was attending the Congressional School, a non-public school. 363 F.Supp. 1202. Insofar as society's interests in educational opportunity for all of its citizens and the removal of invidious discrimination are weighed against society's interests in true independence of non-public educational institutions and freedom of association, especially in connection with close, intimate relationships, we believe that, unlike the right to purchase property involved in Jones v. Alfred H. Mayer Co., the balance is in favor of construing the right to make and enforce contracts protected by § 1981 as being a freedom from legal disability and not as being extended to prohibiting a non-public institution from operating on a racially segregated basis.
 
 
 77
 As we have previously indicated, we do not find it necessary to express an opinion on the constitutional validity of 42 U.S.C. § 1981, but we do feel compelled to say that the result reached by the majority is an unconstitutional and invalid application of the statute. Our conclusion is supported by the opinion of the court in Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), which adopts, in the opinion of the court, the language we have previously quoted from the dissenting opinion of Mr. Justice Douglas in Moose Lodge to the effect that people may band together in their association with whomsoever they please. And those cases specifically refer to the forbidden and highly suspect classifications of race and religion. Nothing in history or the precedents contains any suggestion that the same reasoning applied to a religious school in Pierce, to a social club in Moose Lodge, and indeed (albeit in slightly different context) to private schools in Gilmore, should not apply here. And we think the majority takes too little account of Norwood v. Harrison, for in that case, in a discussion of the precise type of segregated private school involved here, the court unequivocally stated that the very bias here charged is neither invalid nor subject to sanction of law:
 
 
 78
 "Such private bias is not barred by the Constitution, nor does it invoke any sanction of laws, but neither can it call on the Constitution for material aid from the State." 413 U.S. 455, 469, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723.
 
 
 79
 We would reverse the judgment of the district court on all points.
 
 On Petitions for Rehearing
 
 80
 Upon consideration of the petitions for rehearing filed on behalf of the appellants and the appellees,
 
 
 81
 It is ordered that Section IV-A of the opinion be amended, adding at the end thereof a paragraph reading:
 
 
 82
 While allowing damages in favor of the McCrarys against Bobbe's School and in favor of Colin Gonzales because of his minority, the district court denied an award of damages to Mr. and Mrs. Gonzales since it concluded that their claim was foreclosed by the applicable statute of limitations. The statute applied was the first sentence of Virginia Code § 8-24, applicable to actions for personal injuries. It is contended on appeal that the judge should have applied Virginia's five year statute, the second sentence of § 8-24, applicable to actions not otherwise provided for in more specific statutes of limitations. While the action is brought under Section 1981, the damage claim is entirely referable to injured feelings and humiliation. We have held such claims asserted under the Reconstruction Acts to be governed by Virginia's two year statute. Allen v. Gifford, 4th Cir. 462 F.2d 615; see Almond v. Kent, 4th Cir., 459 F.2d 200. It is also contended that the five year statute for actions on a contract, Virginia Code § 8-13, applies, but it is clear that no action on a contract is involved.
 
 
 83
 It is further ordered that the petitions for rehearing be and each of them hereby is denied.
 
 
 84
 Upon consideration of the motion for allowance of attorney's fees on appeal filed on behalf of the appellees,
 
 
 85
 It is ordered that the motion for allowance of attorney's fees be and hereby is denied.
 
 
 86
 In conformity with Alyeska Pipeline Service Company v. Wilderness Society, --- U.S. ---, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), Judge Butzner withdraws that part of his dissent approving the district court's allowance of attorneys' fees on the basis of the private attorneys general theory. However, he retains the section which would affirm the allowance of fees because of the defendants' bad faith. See Alyeska Pipeline Service Company v. Wilderness Society, supra --- U.S. at ---, --- n.46, 95 S.Ct. 1612. Judge Winter and Judge Craven concur in this amendment of Judge Butzner's dissent.
 
 
 87
 Except as modified herein, each member of the court adheres to the position he took in the previously released opinions.
 
 
 
 [1]
 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
 
 
 [2]
 See, Note, Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments, 74 Colum.L.Rev. 449 (1974); Note, Desegregation of Private Schools: Section 1981 as an Alternative to State Action, 62 Geo.L.J. 1363 (1974); Note, Segregation Academies and State Action, 82 Yale L.J. 1436 (1973); Comment, Jones v. Alfred H. Mayer Co. Extended to Private Education: Gonzales v. Fairfax-Brewster School, Inc., 122 U.Pa.L.Rev. 471 (1973); Recent Decisions, 45 Miss.L.J. 246 (1974); Recent Decisions, 8 U.Rich.L.Rev. 285 (1974); Recent Cases, 42 U.Cin.L.Rev. 767 (1973); Recent Cases, 26 Vand.L.Rev. 1307 (1973)
 
 
 [3]
 14 Stat. 27
 
 
 [4]
 Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883)
 
 
 [5]
 After the recent decision of the Virginia Supreme Court in Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145 (1974), it is arguable that the plaintiffs here could recover damages in a state tort action for emotional distress. For an earlier discussion of Virginia's requirement of a resulting physical injury in distress cases, see Hughes v. Moore, 214 Va. 27, 197 S.E.2d 214 (1973)
 
 
 [6]
 In refusing punitive damages, the district court found that the defendants had not "acted recklessly or wilfully in disregard of clear existing law." 363 F.Supp. at 1205 n. 5
 
 
 [7]
 42 U.S.C. § 2000a-3(b)
 
 
 [8]
 20 U.S.C. § 1617 (allowing fees against a "local educational agency, a State . . . or the United States" for a violation of that Act, Title VI of the 1964 Civil Rights Act or the Fourteenth Amendment). See Bradley v. School Board of the City of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Northcross v. Board of Education of the Memphis City Schools, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973)
 
 
 [9]
 United States v. Hunter, 4 Cir., 459 F.2d 205, 214
 
 
 [10]
 After December 31, 1968 the Act applied to all dwellings, 42 U.S.C. § 3603(a)(2), except those enumerated in § 3603(b). In Lee it was not clear whether the Act applied since the transactions occurred before December 31, 1968, and evidence on the applicability of § 3603(a)(1), which covered that time period, was not recounted in the opinion
 
 
 [11]
 42 U.S.C. § 2000e-5(k); Lea v. Cone Mills Corp., 4 Cir., 438 F.2d 86; Robinson v. Lorillard Corp., 4 Cir., 444 F.2d 791
 
 
 [12]
 Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967)
 
 
 [13]
 See Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)
 
 
 *
 See Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973)
 
 
 [1]
 We are not convinced that the district court's findings of fact are not clearly erroneous. Such laments, however, being largely unavailing, see United States v. Johnston, 268 U.S. 220, 227, 45 S.Ct. 496, 69 L.Ed. 925 (1925), we address ourselves to the important legal issue here presented
 
 
 [2]
 In Grier v. Specialized Skills, Inc., 326 F.Supp. 856 (W.D.N.C.1971), the United States District Court for the Western District of North Carolina held the refusal of a barber school to admit black students constituted a violation of § 1981. On the other hand, in Riley v. Adirondack Southern School for Girls, 368 F.Supp. 392 (C.D.Fla.1974), the court refused to apply § 1981 to a racially segregated independent school. The decision is based at least in part on factual determinations. See also Segregation in Private Schools, 122 U. of Penna.L.Rev. 471, at 475 (1973)
 
 
 [3]
 Our dissent is not bottomed on this premise. See Jones, p. 437, 88 S.Ct. 2186
 
 
 [4]
 Our result would be the same whether we construe § 1981 as being in conflict with the constitutional right of free association, or construe it consistent therewith. Of course a statute falls if in conflict with the Constitution. The Federalist, Nos. 16, 78, Hamilton; No. 44, Madison. In this connection, footnote 3 of the district court's opinion is curious (363 F.Supp. 1200 at 1204). That note states that although § 1981 forbids discrimination by whites against non-whites, it does not forbid discrimination by non-whites against whites or other non-whites. Such a construction would make the section clearly unconstitutional. Simply put, the opinion of the district court is that all races, so far as § 1981 is concerned, may operate racially segregated schools except the white race. Either all may do so (as we contend), or none may. Such a restrictive construction of § 1981 also goes against the plain language of the statute. The section provides: "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like (disabilities of various kinds) . . . " (emphasis added). To give non-whites greater rights than whites would run contra to the statute, the same as giving them less rights would violate it
 
 
 [5]
 The force of Mr. Justice Douglas' statement is not reduced by the fact that it was part of a dissenting opinion; in fact, it is accentuated. The issue in the case was whether the fact that a private club dispensed liquor by virtue of a State license made its action State action. The majority thought not; Mr. Justice Douglas thought so. Thus, the quoted language was opposed to the main thrust of the opinion
 
 
 [6]
 The numbers involved in NAACP v. Alabama and Gilmore would seem to indicate that great numbers alone do not necessarily furnish sufficient cause to lose the constitutional protection of freedom of association
 
 
 [7]
 See Julius Stone, Social Dimensions of Law and Justice (Stanford University Press, 1966), Chapter 4, pages 164, et seq., citing Roscoe Pound and other legal scholars. Somewhat this same idea is suggested in 122 U.Penna.L.Rev. 471 at 478, 479 (1973), and 74 Col.L.Rev. 449, 468, 469 (1974)