Chris **VALADEZ** et al., Plaintiffs,

v.

Robert **GRAHAM** et al., Defendants.

No. 78–16–Civ–Oc.

United States District Court,
M. D. Florida,
Ocala Division.

June 18, 1979.

Sheldon H. Laskin, Marcia E. Bove, Florida Rural Legal Services, Inc., Winter Haven, Fla., for plaintiffs.

Gene T. Sellers, Counsel, State Board of Education, Tallahassee, Fla., Stanley E. Marable, Leesburg, Fla., for defendants.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This suit was instituted by migratory school children attending Groveland Junior/Senior High School against local and state education officials [1] alleging that the educational programs provided them are in violation of their constitutional and statutory rights. The Court is presently confronted with defendants' motion for summary judgment [2] and plaintiffs' cross motion for partial summary judgment, both of which were orally argued before the Court on April 25, 1979.

The controversy arises out of plaintiffs' unique position as children of migratory agricultural workers. Each year, plaintiffs travel to other parts of the country with their parents to engage in the harvest of various agricultural products. By necessity, due to the northern harvest in the fall of the year, plaintiffs return to Lake County after commencement of the academic school year. Although most of the plaintiffs return within the first week of classes, some cannot enroll until after the first nine-week grading period has been completed. Those who do return later are confronted with the difficult task of making up the work missed.

Although subsequently modified, the amended complaint alleges the existence of policies at Groveland Junior/Senior High School which operate to undermine plaintiffs' ability to participate in a meaningful educational process. These policies allegedly (1) deny plaintiffs the opportunity to make up work missed and fail to offer programs helping them to make up such work, (2) subject plaintiffs to an arbitrary attendance/grading system resulting in automatic failure if five or more weeks of the quarter are missed, and (3) prevent plaintiffs from transferring credit earned while in attendance at other schools.

Plaintiffs claim that these alleged policies give rise to five causes of action. First, plaintiffs contend that defendants' policies and practices fail to meet the obligations created by Title I of the Elementary and Secondary Education Act, *Programs for Migratory Children*, 20 U.S.C. § 241c-2, now 20 U.S.C. § 2762. Secondly, it is alleged that defendants have unlawfully discriminated against plaintiffs in violation of Title VI of the Civil Rights Act, 42 U.S.C.

---

1. The defendants at the state level are: Robert Graham, Bruce A. Smathers, Gerald A. Lewis, Bill Gunter, James Smith, Doyle Connor and Ralph D. Turlington, in their official capacity as Members of the Florida State Board of Education; Ralph D. Turlington, in his official capacity as Commissioner of Education of the State of Florida; James Moore, in his official capacity as Administrator of the Migrant Education Section of the Florida Department of Education.

 The local defendants are: Clyde E. Stevens, in his official capacity as Director of Region III of the Office of Compensatory Education of the Florida Department of Education, the School Board of Lake County, Florida; James R. Dunaway, Joan Brown, Charles B. Beals, Donald H. Longworth, K. Barbara Wyckoff, individually and in their official capacity as Members of the School Board of Lake County, Florida; Sam B. Commander, individually and in his official capacity as Superintendent of Schools of the Lake County School District; Gil Smith, individually and in his official capacity as former Principal of Groveland High School; and Cecil Gray, individually and in his official capacity as Principal of Groveland High School.

2. In response to plaintiffs' motion for partial summary judgment, state defendants, on May 14, 1979, filed a memorandum of law in opposition. Included in the final prayer to the Court, it is requested that summary judgment be granted in favor of the state defendants. In accordance with Fed.R.Civ.P. 7(b) and 56, the Court construes this as a motion for summary judgment.

§ 2000d. The third and fourth counts of the complaint allege that defendants have violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Finally, it is contended that defendants have acted under color of state law to deprive plaintiffs of their constitutionally protected civil rights in violation of 42 U.S.C. § 1983. These five counts of the complaint have survived motions to dismiss,[3] and the case has been certified as a class action pursuant to Fed.R.Civ.P. 23(b)(2).[4]

The relief sought is in the form of a judgment declaring defendants' actions to be violative of the statutory and constitutional requirements, ordering defendants to alter their policies and practices, restraining defendants from failing to abide by the statutory constitutional mandates, and awarding plaintiffs compensatory and punitive damages and reasonable attorneys' fees. Jurisdiction is based on 28 U.S.C. § 1331 and § 1343.

In their motion for summary judgment, local defendants contend that the undisputed facts show that plaintiffs' claims are without merit. Defendants have, throughout the suit, argued that the policies which plaintiffs attack have never been in existence. Moreover, defendants contend that the policies which are in effect fully comply with any statutory or constitutional requirements. Plaintiffs, on the other hand, seek summary judgment on the first and second count of the complaint, arguing that the educational programs presently available to the migrant students fail to provide the academic assistance called for by Title I, 20 U.S.C. § 2762, and Title VI, 42 U.S.C. § 2000d.

■ The standard by which a motion for summary judgment must be tested is whether from the evidence presented by the "pleadings, depositions, answers to interrog-

atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The purpose of a summary judgment is not to cut litigants off from their right to a trial, *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 468, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 461 (1962), but rather, to avoid a useless trial where there are no issues to try, *Broadway v. City of Montgomery, Alabama*, 530 F.2d 657, 661 (5th Cir. 1976) and to avoid the waste of time and resources of both the litigants and the court where a trial would be useless. *Zweig v. Hearst Corporation*, 521 F.2d 1129, 1135–36 (9th Cir. 1975). The summary judgment procedure is designed to provide a speedy and expeditious disposal of those cases in which there is no genuine need for a trial. *Tanner v. McCall*, 441 F.Supp. 503, 506 (M.D.Fla.1977). Additionally, summary judgment may be appropriate, even when constitutional issues are raised. *Sindermann v. Perry*, 430 F.2d 939, 943 (5th Cir. 1970). Where the court is both the factfinder and the law-applier, summary judgment is available. *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1970).

■ The threshold determination that the Court must make is whether the record shows that there is no genuine issue as to any material fact. A material fact for purposes of a motion for summary judgment is one which is determinative of the parties' duties or rights. *Atkinson v. Jory*, 292 F.2d 169, 171 (10th Cir. 1961). A genuine issue precluding a summary judgment is one that requires a judge or jury to resolve the parties' differing versions of truth at trial. *Mutual Fund Investors, Inc. v. Putnam Management Company, Inc.*, 553 F.2d 620, 624 (9th Cir. 1977); *Allen v. Carlotti*, 400 F.Supp. 1037–39 (S.D.Fla.1975). Despite

---

3. On October 11, 1978, the Court dismissed the first and sixth counts of defendants' complaint. Subsequently, in response to plaintiffs' motion for reconsideration, the Court reinstated Count I of the complaint.

4. The class is defined as "all migratory children of migratory agricultural workers not enrolled at Groveland Junior/Senior High School at the commencement of a school year who are denied the opportunity to make up missed work and/or are not permitted to transfer credit for work performed at other schools."

the parties' contentions to the contrary, however, if the affidavits and other materials submitted by the parties in support of their motions present no dispute as to the material facts, the court should render judgment for the party so entitled. *Central Oil & Supply Corporation v. United States,* 557 F.2d 511, 515 (5th Cir. 1977).

 Irrelevant and immaterial evidence cannot be used to create a genuine issue as to any fact in order to defeat a motion for summary judgment. *McKeithen v. S.S. Frosta,* 430 F.Supp. 899, 901 (E.D.La. 1977). Indeed, only that evidence which could properly be admitted at trial can be relied upon to raise a dispute as to the facts of the case. *Munoz v. International Alliance of Theatrical Stage Employees,* 563 F.2d 205, 207 (5th Cir. 1977).

With these principles in mind, a review of the entire record discloses no genuine dispute as to a material fact which would preclude the entry of a summary judgment. Although there is dispute as to many factual contentions, none are of the materiality which would alter the duties, obligations, or rights of the parties. Consequently, application of the law to those facts which are material, yet undisputed, supports the entry of a judgment without the necessity of a trial.

### I. Constitutional Claims

### A. Equal Protection

Counts III and IV of plaintiffs' amended complaint allege violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. The Equal Protection claim alleges that, through the school attendance/grading and course credit policies, defendants interfered with plaintiffs' fundamental rights to education, interstate travel, and familial privacy. Count III also alleges that defendants intentionally discriminated against plaintiffs as a class of Mexican-American migrant students.

 While it is well established that individuals of Mexican decent are as much entitled to the benefits of the Equal Protection Clause as anyone else, *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *United States v. Texas Education Agency,* 467 F.2d 848, 852 (5th Cir. 1972); *Cisneros v. Corpus Christi Independent School District,* 459 F.2d 13 (5th Cir. 1971), the entitlement alone does not support the claim. The purpose of the Equal Protection Clause of the Fourteenth Amendment was to prevent arbitrary and invidious discrimination directed toward any individual or group by state action. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597, 607 (1976); *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974).

 Whether a class of individuals sharing the same characteristic such as race, color, or national origin has been singled out to be treated differently may be indicated by numerical compilations showing that a disproportionate number of that group are affected. However, state action which affects a greater proportion of one group more than another, standing alone, is not invalid under the Equal Protection Clause. *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). There must be a showing that the facially neutral legislation or policy has the purpose and intent to invidiously discriminate against the disproportionately affected group. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, 464 (1977); *Washington v. Davis,* 426 U.S. at 239, 96 S.Ct. at 2047, 48 L.Ed.2d at 607; *Wright v. Rockefeller,* 376 U.S. 52, 56, 84 S.Ct. 603, 605, 11 L.Ed.2d 512, 515 (1964); *Akins v. Texas,* 325 U.S. 398, 403–04, 65 S.Ct. 1276, 1279–80, 89 L.Ed. 1692, 1696 (1945); *Nevett v. Sides,* 571 F.2d 209, 217 (5th Cir. 1978); *Tyler v. Vickery,* 517 F.2d 1089, 1099–1100 (5th Cir. 1975). In determining whether discriminatory intent exists, the Court may look to, *inter alia,* statistical application, *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), historical development, *Keyes v. School District No. 1, Den-*

*ver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), sequential events, *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and legislative history or other statements of the promulgation, *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). If, indeed, a purpose or intent to discriminate is found, the law or state action may still be valid if that purpose or intent passes muster under the "rational relation" or "compelling state interests" tests.

 In the present case, it is not necessary to reach the question of the intent to discriminate or the rationality of the alleged discriminatory policies because the record is clear that no invidious discrimination is present. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 270–71, 97 S.Ct. at 566–67, 50 L.Ed.2d at 468. It is undisputed that whatever policies defendants maintain in regard to late-entering students are applied across the board to all late-entering students, whether they be black, white, orange, or Mexican-American. This facially neutral application is not invalidated by the fact that a greater proportion of migrant students enter school late. Migrant students as a class are not limited to any single racial or ethnical group, but rather are representative of several races and national origins. That Mexican-Americans are one group found in the migrant workers' camp does not indicate invidious discrimination. The record clearly shows that of the number of Mexican-American students enrolled at Groveland Junior/Senior High School, many are not even categorized as migrant students, thus indicating that not all Mexican-Americans must, by necessity, enter school late. Moreover, a large number of the migrant students who would as a group necessarily be disproportionately affected by the late entrance policies are either Caucasian or black.[5] Finally, the Court may take judicial notice of the fact that in any school district, in any year, there will be some number of students who enter school late or transfer from other schools simply because of sickness or family relocation. These students are also subjected to defendants' late entry policies. There is, consequently, no factual support for the claimed racial discrimination.

 The allegations that defendants' policies interfere with plaintiffs' fundamental rights are likewise unsupportable. First, there is no fundamental right to an education. *San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16, 44 (1973). Consequently, the legitimacy of defendants' policies are tested by the "rational basis" standard. Since the evidence of record negates plaintiffs' claim that students missing more than five weeks are automatically failed, the Court finds that defendants' policies requiring attendance are rationally related to defendants' duty to provide an education to the children of the State of Florida.

 Secondly, although there is a fundamental right to interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), which requires the state action to pass the test of "strict scrutiny", the facts in the present case fail to support the alleged interference. There is absolutely no evidence in the record that defendants' policies, in any manner whatsoever, invade the "sanctity of a man's home and the privacies of life." *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510, 515 (1965). Plaintiffs' claim of interference with the right to interstate travel does not involve a penalty or chilling effect on the exercise of that right which rises to a constitutional violation. By necessity, one who enters a race late cannot start with those who began on time. There is no constitutional principle which requires that the starter either hold up the race or provide a means for the late entrant to

---

5. For the four school years ending with the 1978–79 school year, the number of migrant students who are not of Hispanic ancestry has averaged about one-half (50%) of the total number of identified migrant students.

catch up with the others. Defendants have a compelling interest in seeing that educational instruction is provided on a regular, uninterrupted basis. This interest is served by setting reasonable attendance policies such as the ones defendants have established. Consequently, the Court holds that defendants' policies violate none of plaintiffs' rights under the Equal Protection Clause.

### B. Due Process

In the fourth count of the complaint, plaintiffs allege that defendants' denial of credit for courses taken in other school systems without (1) standards for acceptability of the work, (2) a written statement of reasons justifying decisions in individual cases, and (3) affording students an opportunity to contest these decisions along with defendants' attendance/grading policy which allegedly conclusively presumes that one who misses five or more weeks of school lacks the ability to pass the course deprived plaintiffs of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

In order to pursue a claim of denial of due process, an interest grounded in life, liberty, or property must be at stake. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Hennessey v. National Collegiate Athletic Ass'n*, 564 F.2d 1136 (5th Cir. 1977); *Thurston v. Deckle*, 531 F.2d 1264 (5th Cir. 1976). Once it is determined that the requisite interest is involved, then that interest must be balanced against the governmental interest affected. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 263–71, 90 S.Ct. 1011, 1018–22, 25 L.Ed.2d 287, 296 (1970). The determination of whether a particular interest is entitled to due process protection is not dependent on that interest being specifically named in the federal Constitution. Indeed, "protected interests in property are normally not created by the Constitution", but, rather are "created by an independent source such as state statutes or rules." *Board of Regents v. Roth*, 408 U.S. 564, 577,

92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972).

The right claimed to be involved in the present case is the right to an education. Although the Supreme Court firmly held in *San Antonio School District v. Rodriquez*, 411 U.S. at 35, 93 S.Ct. at 1297, 36 L.Ed.2d at 44, that "education . . . is not among the rights afforded explicit protection under our Federal Constitution", that decision dealt with a claimed equal protection violation and, thus, is not controlling on a due process claim. The decision of the Supreme Court in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), however, does govern the present claim. There it was held that, because state law provided for a free education, the plaintiff, a student, had a "legitimate claim of entitlement" to a public education which could not be withdrawn without due process of law. The present case requires the same analysis.

Section 228.051 Fla.Stat. (1977) states that "public schools of the state shall provide thirteen consecutive years of instruction." A student, therefore, has a "legitimate claim of entitlement" to a public education in the State of Florida, and this right cannot be denied except by due process of law.

Having found that due process applies to plaintiffs' claim, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). Resolution of this question is not to be made in a vacuum, but, rather, common experience and practical necessity play a large role in reaching the balance between state and private interests. Due process, by its very nature, "negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961). Indeed, the necessary degree of procedural safeguards varies directly with the importance of the private interests affected and the need for and

usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other consequences of affording it. *Drummond v. Fulton County Department of Family and Children Services*, 563 F.2d 1200, 1209 (5th Cir. 1977) citing Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1278 (1975).

■ The test employed by the Supreme Court in determining what process is due requires consideration of (1) the private interest at stake, (2) the risk of erroneous decision under present procedures and the improvement in decision making which would flow from additional procedural safeguards, and (3) the governmental interest involved. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33.

■ Applying this test to the instant case, the Court can find no denial of due process. Obviously, the private interest at stake is the right to an education which, in turn, incorporates the right to receive credit for school work performed. Although this interest is, to be sure, important to all students, it does not pose such an intense need that any more than the most limited safeguards are necessary. Secondly, the risk of error is practically nil. The unrefuted evidence in the record indicates that credits, as opposed to course grades, are always accepted. If a student transferring to Groveland Junior/Senior High School has completed a course at another school and received a credit at that other school, that credit is either matched with the same course offered at Groveland or, if not offered at Groveland, then credit is awarded for the course in Groveland's curriculum that most closely corresponds to the course taken at the other school. At no time is a student denied credit for course work fully completed while attending another school.

The transfer of grades received on work attempted at other schools is another matter. There, the other school has not given a final credit for completion of a course, but has only given grades received in working toward completion. The evidence of record shows that efforts are made to incorporate the grade earned at another school into the curriculum being taken at Groveland. Only when the courses are so different that the grade would be meaningless is the grade from the other school disregarded in reaching a final grade for the student in the Groveland course.

Whether a completed credit or only a grade is at stake is a simple mechanical determination. Whether the grade can be matched to courses at Groveland is also a mechanical procedure; either the course is the same or it is not. The teachers, in conjunction with the guidance counselors, make the determination of whether the courses in which credits or grades have been received match those offered at Groveland.

The Court is at a loss to find any better method for transferring credits and grades. Student input would be of minimal value because students cannot possibly know the material to be taught in the courses offered at Groveland. Furthermore, through the migrant student records transfer system the personnel at Groveland are fully informed of each migrant student's work at other schools. Moreover, any student dissatisfied with the school's decision is given the opportunity to speak with the teacher in the guidance office about it. In this informal manner, the possibility of the school denying credit, where credit is due, is very unlikely.

Finally, the school's function is to provide the students with an education. This interest would not be furthered, but would rather be hindered, by placing additional administrative burdens upon the school's personnel. Indeed, requiring a formalized notice and hearing procedure would be attacking an ant of a problem with a cannon of relief. The fairness and reliability of the existing procedures adequately satisfy the requirements of due process.

The record is replete with instances where students entering school after five weeks have been allowed and encouraged to make up the work missed so that the student's performance and ability could be evaluated rather than a grade being as-

sessed solely on the basis of attendance. Those students that claim they were denied the opportunity to make up work have conceded that they never asked to be permitted to make up the work. Thus, there is no factual support for the claim of an impermissible, irrebuttable presumption.

## II. Statutory Claims

### A. Title VI

The second count of the amended complaint alleges that defendants have discriminated against plaintiffs in violation of Title VI of the Civil Rights Act. 42 U.S.C. § 2000d.[6] The contention is that defendants' policies operate to deny plaintiffs the benefits of, or subject plaintiffs to discrimination under, the education programs at Groveland Junior/Senior High School which school receives federal financial assistance. Plaintiffs have moved for a summary judgment as to this count arguing that, as a matter of law, defendants' policies deny plaintiffs equal participation in the educational process at Groveland.

■ Most recently, the Supreme Court had occasion to discuss the reach of Title VI, 42 U.S.C. § 2000d in connection with allegations of discriminatory policies. In *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Court was concerned with whether the type of discrimination prohibited by Title VI was a different animal than that prohibited by the Equal Protection Clause of the Fourteenth Amendment. After reviewing the legislative history of the act, in light of the expressed, intended purposes, the Supreme Court concluded that

> [i]n view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment. 438 U.S. at 287, 98 S.Ct. at 2747, 57 L.Ed.2d at 769. In accord 438 U.S. 326 and 328, 98 S.Ct. 2767

and 2769, 57 L.Ed.2d 793 and 795 (Brennen, J. concurring). *See also Goodwin v. Wyman,* 330 F.Supp. 1038, 1041 (S.D.N.Y. 1971) *aff'd* 406 U.S. 964, 92 S.Ct. 2420, 32 L.Ed.2d 664 (1972).

Consequently, the Court's earlier determination that defendants have not discriminated against plaintiffs in violation of the Equal Protection Clause disposes of the contention that defendants have impermissibly discriminated against them under Title VI.

Alternatively, the Court would deny relief on the basis that plaintiffs have failed to otherwise show a violation of Title VI, 42 U.S.C. § 2000d. In their motion for partial summary judgment, plaintiffs rely heavily on the Supreme Court's decision in *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) where it was held that because a large number of students in the San Francisco school system did not speak English, Title VI was violated when the schools did not provide any remedial instruction in the English language. Likewise, reliance is placed on *Serna v. Portales Municipal Schools,* 499 F.2d 1147 (10th Cir. 1974) where it was held that the school district's failure to provide English language instruction to Spanish surnamed students and the failure to hire Spanish surnamed school personnel in a district comprised of about thirty-five percent Spanish surnamed pupils violated the requisites of Title VI.

In both of these decisions the caveat which is expressly attached is that "numbers are at the heart of this case and only when a substantial group is being deprived of a meaningful education will a Title VI violation exist." *Serna v. Portales Municipal Schools,* 499 F.2d at 1154; *see Lau v. Nichols,* 414 U.S. at 572, 94 S.Ct. at 791, 39 L.Ed. at 8 (Blackmun, J., concurring).

■ At the center of plaintiffs' claim is the contention that plaintiffs are denied "effective participation" in the educational

---

**6.** 42 U.S.C. 2000d provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

programs at Groveland Junior/Senior High School because the make-up policies require them to fully double their workload as they must devote time to their current course work as well as make up of the work missed. This admittedly heavy burden, however, is really borne only by those entering school after a substantial amount of material has been covered. The unrefuted evidence in this case shows that for the past four years, on the average, only about thirty-two migrant students have entered school after the first four weeks of class. These are the students who suffer the most difficulty in attempting to make up work missed. This number, however, does not even approach the 1,800 disadvantaged students confronted by the *Lau* court or the thirty-five percent of the school population addressed in the *Serna* decision. Consequently, the Court could not require Groveland Junior/Senior High School to provide special instruction to these students under Title VI, even if it is assumed that there is discrimination based on race, color, or national origin.

### B. Title I

The first count of the amended complaint alleges that defendants have failed to meet their obligations under the Title I migrant program, 20 U.S.C. § 2762,[7] in that defendants have not provided for plaintiffs' "special educational needs." The basis for this allegation is two pronged: first, plaintiffs assert that the Title I educational program in effect at Groveland Junior/Senior High School, called Learn and Earn, addresses vocational rather than academic needs; and secondly, plaintiffs contend that their true "special educational needs", that of making

up missed work, are not being satisfied by the present make-up policy.

Title I, 20 U.S.C. § 2761, is part of the broad effort on the part of Congress to provide federal funds to support the education of various disadvantaged groups.[8] 20 U.S.C. § 2671, specifically provides federal monies to state educational agencies for the development and establishment of programs of education for migratory children of migratory agricultural workers. The statutory scheme, simply stated, entitles state educational agencies that apply in conformity with certain rules and regulations, to an amount in federal funds based on the number of migratory students enrolled in the state. In order to receive these funds, however, it must be determined:

> (1) that payments will be used for programs and projects . . . which are designed to meet the special educational needs of migratory children of migratory agricultural workers or of migratory fishermen, and to coordinate such programs and projects with similar programs and projects in other States, including the transmittal of pertinent information with respect to school records of such children. 20 U.S.C. § 2762(a)(1).

No more specific as to the type of programs to be administered through the act are the regulations promulgated by the Commissioner of Education. 45 C.F.R. § 116d.39 (1978) provides that the commissioner shall approve a state application only if he determines that:

> (a) payments will be used for programs and projects . . . which are designed to meet the special educational needs of migratory children of migratory

---

7. The complaint alleges violations of 20 U.S.C. § 241e(c), Education of Migratory Children of Migratory Agricultural Workers. Public Law 93–380, Education Amendments of 1974, U.S. Code Cong. & Admin.News, p. 4093 (1974), altered the language slightly and renumbered the section 20 U.S.C. § 241c–2 which was in force when this suit was brought. 20 U.S.C. § 241c–2 was subsequently repealed by Public Law 95–561, U.S.Code Cong. & Admin.News p. 4971 (1978) and replaced by 20 U.S.C. §§ 2761 and 2762. Although the form of the statute has

been altered, except for the additional requirement that Parent Advisory Councils be consulted in planning, no changes in substance have been made.

8. In addition to Programs for Migratory Children, these include Programs for Handicapped Children, 20 U.S.C. § 2771 et seq., Programs for Neglected and Delinquent Children, 20 U.S.C. § 2781 et seq., programs for districts having children of low income families, 20 U.S.C. § 2701 et seq., and others.

agricultural workers or of migratory fishermen, and to coordinate these programs and projects with similar programs and projects in other states, including the transmittal of pertinent information with respect to school records of these children;

(b) services to be provided show reasonable promise of meeting the special educational needs of migratory children of migratory agricultural workers and migratory fishermen as demonstrated by the needs assessment required by § 116d.31(b)(3) particularly with respect to improvements in the educational performance of children in the basic programs of instruction; and that payments under this part will be used for programs and projects which are of sufficient size, scope and quality to give reasonable promise of substantial progress toward meeting such needs.

To help assess the needs of the migratory school children, both the statute, 20 U.S.C. § 2762(a)(4), and the corresponding regulations, § 116d.37 C.F.R. (1978) require that Parent Advisory Councils be established so that parents of the children can provide input into the types of programs offered.

Groveland Junior/Senior High School participates in the migrant education program. For several years, the only program provided the migrant students through Title I funding has been the course entitled Learn and Earn which encompasses vocational study in the areas of sewing, marine engine repair, small engine repair, carpentry, consumer education, filing, typing, and others.

Groveland does not provide any particularized make-up curriculum for migrant students through Title I funding. There is, and the record indicates that there has always been, a policy at Groveland allowing students who enroll after school has begun to make up the work missed. The procedure for making up missed work is not formalized, but, rather, is informally worked out between the student and his or her teacher. There is no support in the record for the contention that a student entering school after the fifth week of class is prohibited from attempting to make up missed work or that the student automatically receives a failing grade for the period missed. What is evident from the record is that the responsibility for arranging to make up work is placed on the student. The teacher in whose class a student enrolls late must, in turn, make available to the student the class assignments and the homework assigned during the student's absence.

In what may be termed a general indictment of the Title I migrant program at Groveland, plaintiffs allege that the programs offered to the migratory students fail to adequately satisfy their "special educational needs". They insist that the make-up program in existence is excessively burdensome and punitive and, consequently, the students are instilled with a fatalistic attitude toward even attempting to make up missed work. Plaintiffs contend that a proper needs assessment would disclose that their "special educational needs" require some method of *intensive* make-up instruction whereby the high points of missed material would be separated and presented to the student in condensed form. Additionally, at oral argument on the motions for summary judgment, plaintiffs suggested that a "pull out" program could be established to allow the students the opportunity to remove themselves from the general student body in order to learn missed material.

If sufficient time were available, it is certain that additional, alternative programs could be devised. That, however, is not the duty or the responsibility of the Court. At this juncture, the Court must only determine whether, based on the evidence in the record, defendants have violated or are violating the requirements of 20 U.S.C. § 2762 and 45 C.F.R. § 116d.39 as a matter of law.

██ The parties have cited no case, nor can the Court by its own research uncover any authority, that squarely addresses the meaning of the terms "special educational needs" and "basic programs of instruction". Indeed, this case seems to be the first of its

kind. As noted above, neither the statute nor the regulation provide any interpretative explanation. A review of the legislative history accompanying the 1978 amendments to Title I discloses only a recognition by Congress that more clearly defined guidelines should be established.[9] The 1978 amendments to the regulation show that the language of 45 C.F.R. § 116d.39 has been changed slightly but without any apparent intention of changing the underlying meaning of the section.[10] The terms "basic programs of instruction" and, particularly, "special educational needs" should be read broadly enough to ensure that the recipient states are allowed some degree of latitude in determining the programs to be established. After all, it is the state educational authorities and their local representatives that work most closely with the teachers, parents, and students in developing migratory student programs.

The Learn and Earn program at Groveland Junior/Senior High School is a result of state and local efforts. It was, and is, obviously approved by the Commissioner of Education who set the criteria and standards for acceptability. There is no evidence that, at any time prior to the institution of this suit, the parents of the migratory children, or even the children themselves, ever proclaimed dissatisfaction with the available Title I program at Groveland.

As shown by the depositions in the record, although the Learn and Earn course is vocationally oriented, oftentimes extra help is given to a student in the areas of reading and math. Consequently, it cannot be said that the Groveland program entirely disregards the "basic academic subjects", and it

may be that such a nonstructured approach to the problem is more successful than the regimented confines of the classroom.

The same may be said about Groveland's informal make-up program which is not funded by Title I funds. It is undisputed that, at least after the 1977 school year, Groveland Junior/Senior High School maintained a written policy allowing all students to make up missed work. However, the method and manner of making up the material is left to the student and teacher. As dedicated as most teachers are, this type of system may more than adequately supply a student's need for intense instruction and truly assist those students that are willing to make the effort.

This is not a case where Title I funds are received, but no program is presented to the migrant students. Nor is it a case where those responsible for administering the program have utterly failed to obtain input from the proper sources or have failed to properly review Title I applications. *See Nicholson v. Pittenger*, 364 F.Supp. 669 (E.D.Pa.1973). Nor is it a case where the duty to develop meaningful programs has been improperly delegated to local officials. *Barrera v. Wheeler*, 531 F.2d 402 (8th Cir. 1976).[11]

■ What this case does appear to be is one in which the plaintiffs seek to substitute their judgment for that of the teachers, parents, and educational authorities who designed the migrant program at Groveland Junior/Senior High School. Although there may be a legal entitlement to the special benefits provided by Title I funds, there is not, and cannot be, a statuto-

9. Education Amendments of 1978 Pub.L. 95–561, U.S.Code Cong. & Admin.News, p. 5011 (1978).

10. The interim regulation 45 C.F.R. § 116d.39(b) read
 . . . particularly with respect to improvements in the educational performance of children in the basic programs of instruction;
 The final regulation § 116d.39(b), published in Federal Register, Nov. 13, 1978, 43 Fed.Reg. .52672, 52683 (1978) changed the language to

. . . particularly any need for improvement in the basic academic subjects.
 In summarizing the changes from the interim final regulations, the Commissioner did not warrant this change noteworthy.

11. The question raised in *Barrera* was whether the special educational programs provided the educationally deprived children in private schools were comparable with those provided the children in public schools. The court there was reluctant to decide which specific programs and services had to be supplied in order to assure comparability. 531 F.2d at 408 n. 8.

ry assurance that the programs will be the best or the most perfect imaginable. Indeed, it would be a difficult, if not an impossible, task for any court to determine which one of two or more programs most effectively assisted migrant students in their schooling. Of course, the Court does not mean to imply that defendants can do no wrong; only that when a program is developed that arguably addresses the "special educational needs" of migrant students, defendants should not be held in violation of Title 1, 20 U.S.C. § 2762 or the regulations promulgated thereunder.

### C. 42 U.S.C. § 1983

In the fifth count of plaintiffs' complaint, violations of the Civil Rights Act are alleged. 42 U.S.C. § 1983 proscribes the deprivation, under color of state law, of any rights, privileges, or immunities secured by the Constitution or law of the United States. The federal rights claimed to have been violated in this case, are those secured by the Fourteenth Amendment, 42 U.S.C. § 2000d and 20 U.S.C. § 2761 et seq.

Since the Court has ruled above that there has been no violations of federal law or constitutional principles, claiming civil rights violations based on these same constitutional and statutory provisions must also fail as a matter of law. *United Handicapped Federation v. Andre*, 409 F.Supp. 1297, 1301 (D.Minn.1976) *rev'd on other grounds*, 558 F.2d 413 (8th Cir. 1977); *Kaznoski v. Consolidation Coal Co.*, 368 F.Supp. 1022, 1024 (W.D.Pa.1974) *aff'd* 506 F.2d 1051 (3d Cir. 1974).

Alternatively, the Court would deny relief in damages on the basis of defendants' qualified good-faith immunity from suit. The Supreme Court's decision in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) made clear the extent to which school officials are subject to suit for damages under 42 U.S.C. § 1983. Although there the court refused to grant school administrators absolute immunity, because school board members function in the nature of legislators, adjudicators, and administrators, the court found it necessary to extend a qualified, good-faith immunity to school decision-makers acting in their official capacity. This limited immunity is unavailable, however, if the official knew, or reasonably should have known, that the action taken would violate the constitutional rights of the students affected, or if the official took the action with the malicious intention to cause the deprivation of constitutional rights. *Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1000, 43 L.Ed.2d at 225; *Proconier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24, 31 (1978).

In the present case, even if it were found that defendants' actions have violated plaintiffs' constitutional or statutory rights, defendants could not be held liable in damages because first, the constitutional and statutory rights were not so clearly established at the time in the context of special educational programs that defendants can be held to a knowledge of the violation, and secondly, there is absolutely no evidence, or even the allegation, that defendants' actions were taken with any malicious intent.

### III. Conclusion

Although plaintiffs have presented a compelling case for the institution of additional or alternative educational programs for migratory children of migratory farmworkers, the Court has been unable to find a legally cognizable right to the suggestions made. Therefore, the Court holds that, based on the undisputed material facts in this case, defendants, not plaintiffs, are entitled to a judgment as a matter of law. Accordingly, judgment will be entered for defendants.